[Nos. 39246, 39247, 39248, 39249, 39250.   Department One.   August 29, 1968.]

GEORGE MATSUMURA, *Respondent*, v. NORMAN L. EILERT *et al., Defendants,* DOROTHY HUYCK *et al., Appellants.*

MIKE HATTORI *et al., Respondents,* v. NORMAN L. EILERT *et al., Defendants,* DOROTHY HUYCK *et al., Appellants.*

TONY MAYEDA, *Respondent,* v. NORMAN L. EILERT *et al., Defendants,* DOROTHY HUYCK *et al., Appellants.*

ROBERT ROLOFF, *Respondent,* v. NORMAN L. EILERT *et al., Defendants,* DOROTHY HUYCK *et al., Appellants.*

HIRO YAMAMOTO, *Respondent,* v. NORMAN L. EILERT *et al., Defendants,* DOROTHY HUYCK *et al., Appellants.*\*

\*Reported in 444 P.2d 806.

*Cross & Swyter,* by *Gordon Swyter,* for appellants.

*James D. Kendall, Velikanje, Moore & Countryman,* and *John S. Moore,* for respondents.

HALE, J.—Before the sins of an agent can be visited upon his principal, the agency must be first established. Huyck & Sons, farmers in Lompoc, California, sold 400 sacks of beans for delivery to Empire Seed Company in Othello. One Leo Sullivan, acting as a sort of intermediary in Lompoc, negotiated the sale and arranged shipment. Empire Seed then sold the beans to plaintiffs, farmers in the Columbia Basin area, who planted them. Although of good quality, the beans proved to be the wrong variety, matured too late for the Columbia Basin climate, and produced a scanty yield. Plaintiffs seek to hold Huyck & Sons liable for the blunder.

Whether Sullivan was the agent for the seller or the buyer becomes the pivotal question. If he acted as the agent for Huyck & Sons, several other questions arise; if he was not the seller's agent, the other questions become academic. The trial judge held Leo Sullivan to be the seller's agent, but we have definitive doubts about it.

In 1962, Hiro Yamamoto, a farmer in the Royal Slope district near Othello, and one of five plaintiffs here, planted a variety of beans called *Sutter Pink* which he had purchased from Empire Seed Company of Othello. The Sutter Pinks produced a remarkably good crop, so he decided to plant them again in 1963. He kept enough of his 1962 crop to seed 5 acres and ordered Sutter Pink seed for 50 more acres from Mr. Fenton Hirschi, an agronomist and seed expert representing Empire Seed Company. This time the results were bad. The 5 acres Mr. Yamamoto planted with his own Sutter Pinks yielded 29 100-pound bags to the acre

while the 50 acres planted with the supposed Sutter Pinks purchased from Empire Seed, despite a healthy luxuriant foliage, came out at 6½ sacks to the acre, yet both areas were of nearly identical soil and had received the same farming treatment.

Other capable farmers had the same experience with the seeds obtained from Empire Seed Company in 1963. Mike and Jack Hattori, Tony Mayeda and Robert Roloff all planted what they thought were Sutter Pink bean seeds and got an inordinately poor yield. On learning that the seeds delivered to them by Empire Seed Company were California Pinks and not Sutter Pinks, they each brought separate actions for damages. The California Pinks, although sound and healthy and in no way substandard, had a later maturing date than Sutter Pinks and thus were not suitable for the Columbia Basin growing season.

Plaintiffs brought separate actions against the Huycks, naming Dorothy Huyck and John Huyck, surviving widow and son respectively coadministrators of Laurence J. Huyck's estate, as defendants. Defendants now bring a consolidated appeal from judgments entered as follows: George Matsumura, $2,087.58; Mike Hattori and Jack Hattori, $4,878.90; Tony Mayeda, $15,140.09; Robert Roloff, $11,082.88; Hiro Yamamoto, $7,068.86.

It all came about through a series of interrelated but loosely connected events. In 1962, Empire Seed Company of Othello had bought Sutter Pink bean seeds from Northwest Pea & Bean Company of Spokane, which, in turn had obtained them from the Bean Growers Association of California. These seed beans had been shipped to Empire Seed Company at Othello in 100-pound bags marked in clear stenciling "California Pink Beans" and which contained no indication or symbol whatever that they were *Sutter* Pinks. Empire Seed in turn sold and delivered these seeds in the same sacks to several row-crop farmers in the Columbia Basin area, including four of the five plaintiffs here, and they all had great success with them.

Next year, 1963, Empire Seed Company, through Norman Eilert, its president, telephoned Harold J. Roffler, President

of Northwest Pea & Bean Company, and requested delivery of 400 to 450 bags (100 pounds each) of Sutter Pink bean seed for their customers in the Columbia Basin district. Mr. Roffler told Mr. Eilert that, because of heavy rains on the 1962 California crop, Sutter Pinks were unobtainable from the California Bean Growers Association, but he would see what could be done to get them elsewhere, mentioning at the time a Mr. Sullivan with whom Roffler had earlier corresponded.

It turned out that earlier, in late January, 1963, Leo L. Sullivan of Lompoc, California, had written to Northwest Pea & Bean Company on plain stationery, without letterhead or other business insignia, stating that he had learned of that company through the Spokane Chamber of Commerce. The letter said that for years Sullivan had purchased bean seeds for three companies, one in San Francisco, another in Los Angeles, and a third in Salinas, California, and that he wanted to increase his business by selling to outside bean companies. He knew he could save his buyers from 50 cents to $1.50 per 100 pounds. Mr. Roffler had answered this letter February 2, 1963, explaining that their company had very little occasion to handle California varieties and then only in small quantities.

Remembering this correspondence, Roffler again wrote Sullivan, at his address in Lompoc, California, March 20, 1963, saying, "We are interested in securing 400 to 450/100# bags of Sutter Pink beans suitable for seed purposes." But, referring to possible rain damage, Roffler cautioned that, even if the seeds had a high germination test, they had to be of good appearance. The letter said, "Please let us know what you can do for us, as we would probably want to take delivery around April 1."

Either Eilert or Hirschi of Empire Seed told Roffler to order the beans at the price indicated by Sullivan if the beans showed a satisfactory germination test. Accordingly, Northwest Pea & Bean Company, March 28, 1963, sent to Sullivan at the Lompoc address the following telegram:

Our people interested in buying one truckload, 400 to 442 bags pinks at $10.25 FOB, but must have germination

test. Would book subject satisfactory germination which you should be able to get in about 8 days. As soon as germination test available would make payment, and take delivery.

With receipt of that telegram, Sullivan set out to buy 400 bags of beans and did arrange a sale from Huyck & Sons.

Laurence Huyck had been farming in the Lompoc area of Southern California for more than 30 years. From 1953 on, he farmed 500 to 700 acres, his principal crops being beans, sugar beets and flowers, 300 to 400 acres of which were in beans, the bean crops including a variety of beans—small whites, Navy whites and pinks and, on special contract, a variety of pole or string beans. Since 1953, his farming operation had been conducted in partnership with his two sons. Huyck & Sons were members of the Farm Bureau and the California Sugar Beet Growers Association, but belonged to no other bean marketing group. Neither Laurence Huyck nor his two sons had even heard of Sutter Pinks[1] or of the name *Sutter* in connection with beans. Despite a long experience in bean farming in the Lompoc area, the only pink beans they had ever heard of or knew anything about was the variety which they had grown for many years and which was known to them simply as pinks or, as they were sometimes called, California Pinks.

John Huyck, one of the sons, was present when the sale of the beans in issue was made through Mr. Sullivan. The Huycks, as was their usual practice, had sold off part of their 1961 bean crop and taken the remainder to the warehouse in Lompoc where the beans were cleaned and bagged, given a lot number, 554, and held for final sale. As John Huyck testified, Leo Sullivan, whom they had known and with whom they had done business occasionally for about 2 years, first got in touch with the Huycks toward

---

[1] "That at the time of the sale, Laurence Huyck had been engaged in farming near Lompoc, California for almost 30 years and had been engaged in growing beans for many years. He had never heard of Sutter Pink variety of beans and had made no effort to familiarize himself with different varieties of California Pink beans." Finding of fact 4.

the end of March, 1963. John Huyck, the son, said Sullivan first contacted them while his father, Laurence, and he were in Lompoc at the Lompoc Equipment Company. Sullivan sought them out and introduced the subject of the beans.

According to John Huyck's testimony, Sullivan said he knew that the Huycks had 400 sacks of pink beans in the Lompoc warehouse and asked if and at what price they would sell them. Huyck said $10 a sack and Sullivan said, "I'll see what I can do." Sullivan, at the request of Northwest Pea & Bean Company, then had a germination test run which proved highly satisfactory. He returned to the Huycks to say that he would take the beans at $10 per sack. He advised Roffler that a check in payment for the beans should be sent him with the amount computed at $10 per 100-pound sack payable to Huyck and a commission check at 25 cents per sack payable to himself. Thereafter, Empire Seed Company, in writing, confirmed the purchase of the seed beans at the stated price.

Later, Sullivan delivered to Laurence Huyck a check payable to Laurence Huyck in the amount of $4,000, dated April 14, 1963, containing the imprint and signature of Empire Seed Company as maker. Plaintiffs' claim that Sullivan was the agent of the Huycks in this transaction rests heavily on the words "400 bags Sutter Pink seed beans" typed across the left top margin of the check. With delivery of the check, Sullivan handed Huyck a prepared release form dated April 19, 1963, which Bill Huyck signed for Huyck & Sons, directing the Lompoc warehouse to release to Empire Seed Company 400 sacks of pink beans, lot No. 554. The release form nowhere contained the word "Sutter."

The beans ordered and designated by Leo Sullivan arrived at Empire Seed Company in their original sacks. Empire Seed removed the seeds from the sacks, treated the seeds chemically for disease and replaced them in the same sacks. The seeds were, after treatment, thus delivered to plaintiff farmers in the identical sacks in which they had left the Lompoc warehouse and bearing the clear marking "California Pink Beans" legibly stenciled on each sack.

For whom was Leo Sullivan acting when he negotiated the purchase of the bean seed from Huyck & Sons? Did these events establish an agency between him and Huyck & Sons, culminating with his delivery to them as their agent of the $4,000 check containing the notation "400 bags Sutter Pink seed beans?" Or, parenthetically, as is argued by plaintiffs, would that notation, even in the absence of an agency, so charge the Huycks with notice that they were undertaking to sell and the buyer undertaking to buy a specific variety of beans called "Sutter Pink" beans that they would become liable to plaintiffs for selling the wrong variety?

■ An agency relationship, of course, may arise without an express understanding between the principal and agent that it be created. It does not depend upon an express undertaking between them that the relationship exists. *Petersen v. Turnbull*, 68 Wn.2d 231, 412 P.2d 349 (1966). If, under the circumstances, the parties by their conduct have created an agency in fact, then it exists in law.

But the agency does not come into existence out of thin air. It does not exist unless the facts, either expressly or by inference, establish that one person is acting at the instance of and in some material degree under the direction and control of the other. It arises from manifestations that one party consents that another shall act on his behalf and subject to his control, and corresponding manifestations of consent by another party to act on behalf of and subject to the control of the other. Restatement (Second) of Agency § 1 (1958).

The record shows us no facts or circumstances from which it can be said that an agency relationship developed between Laurence Huyck as seller of the beans and Leo Sullivan. Sullivan discovered that Huyck & Sons had several hundred sacks of pink beans of a specific lot number in the Lompoc warehouse and that they were labeled "California Pink Beans" before he sought Huyck out. He got in touch with Mr. Huyck and asked whether the beans were for sale and their price. Mr. Huyck said they were for sale at $10 per 100-pound sack and Sullivan said then that he

believed a deal could be made, requesting the time to make a final ascertainment.

Sullivan had the germination test made, not at Huyck's request, but at the direction of others—a test which proved highly satisfactory. On receiving word from Sullivan that the price and cash terms were agreeable to Huyck, Empire Seed Company sent Sullivan two checks, the one payable to Huyck in the sum of $4,000 containing the typewritten notation as to Sutter beans, and the commission check payable to Leo Sullivan in the sum of $100 and having a similarly placed notation that "Commission @ 25¢ cwt. on 400 bags Sutter Pink seed beans." Empire Seed Company, with no further communication to or from Huyck & Sons, then by telegram requested the Lompoc warehouse to "release 400 bags pink bean seed" to Little Audrey's Trucking Company for pickup on April 23, 1963.

Sullivan then returned to Huyck & Sons, handed them a check for $4,000 and a release prepared for signature which directed the warehouse to deliver the seeds to Empire Seed Company of Othello. With the acceptance of the check and delivery of the warehouse release, the transaction between Huyck and Sullivan ended.

The evidence thus shows that, if Sullivan acted as an agent for anyone, he did so for Northwest Pea & Bean Company and Empire Seed Company. These two companies instructed him to locate and negotiate a purchase of *Sutter* Pink seed beans; they directed him to have a germination test made; and they relied upon him to procure on their behalf at a satisfactory price beans of a particular type and description. Northwest Pea & Bean Company had Sullivan arrange for release of the beans from the warehouse to Empire Seed Company and then from the warehouse to Empire's designate, the Little Audrey's Trucking Company, on their order. Empire Seed, without reference to Huyck & Sons, paid Sullivan his commission for his service and had Sullivan deliver its check to Huyck & Sons in payment.

The evidence thus fails to establish an agency between Huyck and Sullivan for it nowhere shows that the Huycks

manifested any consent that Sullivan acted on their behalf and subject to their control nor any corresponding consent by Sullivan that he would do so. See Restatement (Second) of Agency § 1 (1958). Contrarily, the evidence showed Sullivan at the time to be acting at the instance, direction and control of others. Thus, the record conclusively demonstrates that neither Huyck nor his wife and son as administrators of his estate (although the judgment appears to run against them personally and not against Huyck's estate) is liable for the acts and omissions of Leo Sullivan under any theory of principal and agent.

Nor does the record support any theory of liability on the part of the Huycks based on negligence or misrepresentation, for aside from cashing the $4,000 check containing the typewritten notation, it is devoid of any proof that the Huycks represented the beans to be *Sutter* Pinks or that Sullivan ever communicated to them the idea that he was ordering *Sutter* Pinks from them. The record shows that Northwest Pea & Bean Company and Empire Seed Company ordered *Sutter* Pink beans from Leo Sullivan; but not that Leo Sullivan ever ordered *Sutter* Pinks from Huyck or ever used the term *Sutter* in describing the bean purchase he was arranging. Aside from the obscure reference to Sutter Pink seed beans on the check, the record shows no evidence that the word *Sutter* was ever communicated to or used by Huyck. At no time in the chain of events can we find evidence that Sullivan ordered *Sutter* Pinks from the Huycks, nor any circumstances from which negligence can be attributed to the Huycks in failing to observe that the Empire Seed Company had intended to order Sutter Pinks from them. Proof was undisputed that the Huycks had never heard of Sutter Pinks or ever heard the word *Sutter* used in conjunction with beans or knew of the existence of such a variety.

The lone typewritten notation on the check, alluding as it did to a variety of beans which the seller had never heard of, did not, in our opinion, place the Huycks on notice that Sutter Pinks were the variety ordered, and,

therefore, the notation did not suffice to create an inference of negligence or misrepresentation in delivery of the beans to Empire from the Lompoc warehouse company.

Laurence Huyck, senior partner in Huyck & Sons, and father of the other two, died in 1965, before trial of this action. His surviving widow and his son John had been appointed coadministrators of his estate, and plaintiffs named them as defendants in this action. Since we find no basis for liability on the part of Laurence Huyck, deceased, and his coadministrators, it is unnecessary to discuss those remaining assignments of error which concern the court's jurisdiction under the long-arm statute (RCW 4.28.185), and whether Laurence Huyck committed a tortious act thereunder within the state of Washington.

The judgment is reversed with instructions to dismiss plaintiffs' complaints against appellants herein in each of the consolidated cases.

HILL, ROSELLINI, and McGOVERN, JJ., and DONWORTH, J. Pro Tem., concur.

October 16, 1968. Petition for rehearing denied.