529 P.2d 1293

John W. WHEELER and Collene Wheeler,
husband and wife, Plaintiffs-
Appellants,

v.

Larry SMITH and the State of Idaho,
Defendants-Respondents,

and

Edgar Leo Jenkins, Defendant.

No. 11544.

Supreme Court of Idaho.

Dec. 20, 1974.

Jay D. Sudweeks of May, May & Sudweeks, Twin Falls, for plaintiffs-appellants.

Peter C. Jenkins of Eberle, Berlin, Kading, Turnbow & Gillespie, Boise, under appointment as Sp. Asst. Atty. Gen. by Atty. Gen. W. Anthony Park, for defendants-respondents.

BAKES, Justice.

On October 6, 1972, Edgar Leo Jenkins shot John W. Wheeler with a .38 caliber revolver in the presence of his wife, Collene Wheeler. John Wheeler was severely injured and required extensive medical treatment as a result of the wound which he received. The Wheelers brought suit against Jenkins, asking for judgment to be entered against him for damages arising out of John Wheeler's physical injuries and Collene Wheeler's emotional distress. They later amended their complaint to include Larry Smith, a conservation officer of the Idaho State Fish & Game Department, and his employer, the State of Idaho, as co-defendants, and prayed that judgment also be entered against them. Smith and the State of Idaho were dismissed from the action upon their motion for summary judgment, and the Wheelers have appealed from that order.

The shooting took place in Rocky Bar, an isolated village in Elmore County, the night before the opening day of hunting season in 1972. Conservation officer Smith was investigating one Pat Keeney

who he suspected had purchased a resident hunting license even though he was not a resident of Idaho. He stopped at a bar and grill operated by Jenkins and his wife to ask if Jenkins knew where Keeney was. Jenkins knew and gave Smith directions to a cabin a quarter of a mile away where Keeney was staying. Moreover, Jenkins, who disliked and distrusted Keeney, warned Smith to be on the alert for trouble when he made his inquiry. Jenkins even volunteered to accompany Smith when Smith went to the cabin, but Smith refused the offer of assistance. Nevertheless, Jenkins told Smith that if he hadn't heard from Smith in twenty or thirty minutes that he would go to the cabin to check on Smith. Smith allegedly said if Jenkins thought there might be a problem Jenkins could come up later.

Smith left Jenkins, and went to the cabin where Pat Keeney was staying along with Wheeler, his wife and others in the party. When he was told that Keeney was present, he asked to talk to him alone. Keeney agreed, and he and Smith went into a rear room, the kitchen, where Smith began to discuss the license problem with him. While they were talking, other members of the party who were in the cabin when Smith came to the door, went in and out of the kitchen and they became aware that Smith's visit concerned Keeney's hunting license. Keeney's friends were indignant with Smith and his efforts. John Wheeler, in particular, showed his displeasure, according to Smith's deposition, by telling Smith that he was a liar and demanding to know the real reason why Smith was there.

Keeney wanted to know what punishment he might be subject to for having purchased the wrong license. Smith replied that he didn't know and left the cabin, driving into Rocky Bar and past Jenkins' cafe to a spot where he could make radio contact with Emmett, Idaho, to find out the answer to Keeney's question. He then returned to the cabin to continue his talk with Keeney. Smith had not returned

to the cafe to assure Jenkins he had encountered no problems, however, and eventually Jenkins, becoming concerned for him, went to the area of the cabin to investigate. Jenkins had also rented out a cabin next to the one Wheeler and Keeney were using; his trip was to serve the dual purpose of checking on that cabin and on Smith.

The driveway to Jenkins' cabin was obstructed by a car owned by one of the occupants of the Wheelers' cabin where Keeney was staying. Jenkins, who testified that he normally kept a gun in his pickup, strapped the gun on and went to the cabin door to ask that the vehicle be moved. When he came to the cabin door, Jenkins could not see Smith, but knew Smith was there because he recognized Smith's voice coming from a back room. Jenkins asked that the vehicle blocking his driveway be moved, and its owner agreed to move it. But then, according to Jenkins' deposition, Wheeler became very upset, demanding to know what the real reason for Jenkins' visit to the cabin was, and he and two others advanced upon Jenkins. At this point, Jenkins shot Wheeler, claiming to have acted in self defense.

Smith was in the kitchen when he heard the shot. He left the cabin through the back door and went around to the front, where he first became aware of Jenkins' and Wheeler's disagreement. Smith was not trained in first aid and did not render assistance to the victim. Rather, he first separated Jenkins from the others by persuading Jenkins to get into his pickup and leave. Members of the Wheeler party directed Smith to call an ambulance on his truck radio. Then, observing that Wheeler was apparently being tended to by his friends, Smith told Keeney to get into Smith's pickup and they drove to a place where the radio signal from his truck would reach the nearest radio repeater and called an ambulance. While Smith was talking on the radio, Wheeler was put into a vehicle by his friends and driven to meet

the ambulance which Smith was summoning. After Wheeler had been taken from the area, Smith and Keeney returned to the cabin and Smith then formally arrested Keeney for illegally possessing a resident hunting license.

The Wheelers argue that summary judgment was improperly granted because the evidence before the court showed that there was a genuine dispute concerning (1) whether Jenkins was acting as Smith's agent when he shot Wheeler, and (2) whether Smith's negligence was the proximate cause of Jenkins shooting Wheeler.

Summary judgment is improperly granted when the evidence before the court on a motion for summary judgment shows that there is a genuine issue of material fact. I.R.C.P. 56(c); Langroise v. Becker, 96 Idaho 218, 526 P.2d 178 (1974).

On the matter first urged by the Wheelers, as the Supreme Court of Washington said in Matsumura v. Eilert, Wash., 444 P.2d 806 (1968):

"Before the sins of an agent can be visited upon his principal, the agency must first be established." 444 P.2d at 807.

The Court went on to say:

"[Agency] does not exist unless the facts, either expressly or by inference, establish that one person is acting at the instance of and in some material degree under the direction and control of the other." 444 P.2d at 810.

■ The record is devoid of any suggestion that Jenkins was acting at Smith's behest and under Smith's supervision, and therefore neither Smith nor the State of Idaho is responsible for Jenkins' actions under a *respondeat superior* theory. The trial court's finding that there was no agency relationship between them is upheld.

■■ The Wheelers further argue that Smith himself was negligent in several re-spects, and that this negligence proximately caused or aggravated their injuries. They assert that Smith was negligent in failing to anticipate that Jenkins would come to the cabin. They further assert that Smith was illegally arresting Keeney—arresting him at night without a warrant for a misdemeanor—which was negligence *per se*. If Smith was acting illegally in arresting Keeney, which would be negligence *per se*, Kinney v. Smith, 95 Idaho 328, 508 P.2d 1234 (1973), or if Smith was negligent in failing to insist that Jenkins not come to the cabin, the connection between these actions or omissions was so remote and attenuated, and the eventual happening so unforeseeable, that we can say as a matter of law, if Smith was indeed negligent, that such negligence was not the proximate cause of the injury. *See* Palsgraf v. Long Island R. Co., 248 N.Y. 339, 162 N.E. 99 (1928); Prosser, Law of Torts, 4th Ed., ch. 7, pp. 236–289, § 41–44 (1971).

■ Finally, Wheeler maintains that Smith failed to render assistance to him and that this amounted to a breach of a peace officer's duty to the general public. Whether or not a peace officer is under a duty to render emergency aid to members of the public has not been decided in this state, nor has it been decided if a conservation officer is a peace officer, and we do not decide these questions now. We agree with the trial court that Smith did not act unreasonably in leaving the vicinity as demanded to radio for an ambulance rather than immediately attempting to give Wheeler first aid, and thus conclude that even if Smith was under a duty to render aid, he did not breach that duty.

Judgment affirmed. Costs to respondents.

SHEPARD, C. J., and DONALDSON and McQUADE, JJ., concur.