137 P.3d 865 (2006)
AMERICAN SAFETY CASUALTY INSURANCE COMPANY, a foreign corporation, Appellant,
v.
CITY OF OLYMPIA, Respondent.
No. 33446-1-II.
Court of Appeals of Washington, Division 2.
June 27, 2006.
Deborah Lynn Carstens, Jerret E. Sale, Bullivant Houser Bailey PC, Seattle, WA, for Appellant.
Athan Emmanuel Tramountanas, Thomas Harding Wolfendale, Preston Gates & Ellis LLP, Seattle, WA, for Respondent.
VAN DEREN, A.C.J.
¶ 1 American Safety Casualty Insurance Company (American Safety) appeals the trial court's ruling granting summary judgment in favor of the City of Olympia. American Safety acted as a surety for Katspan Inc. on a contract between the City and Katspan. It argues that the trial court erred because material issues of fact exist about (1) whether *866 the City waived the contract's lawsuit and protest time limits; and (2) whether the City prevented American Safety from complying with the contract's claim information requirements. Further, American Safety argues that the trial court erred when it awarded the City attorney fees. Finding that material issues of fact remain to be resolved, we reverse and remand for trial.

FACTS

I. BACKGROUND

A. The Construction Project
¶ 2 In July 2000, Katspan, a general contractor, entered into a contract with the City of Olympia for Katspan to complete a public works construction project called the LOTT Southern Connection Pipeline. LOTT Wastewater Management Partnership, now known as the LOTT Alliance, managed the project.
¶ 3 American Safety issued a payment and performance bond for Katspan with the City as the obligee. Katspan entered into a general agreement of indemnity with American Safety in which Katspan assigned all its rights to receive payment from the City on the LOTT project to American Safety.
¶ 4 The LOTT project is a system of sewer lines that route wastewater from Tumwater to the LOTT Wastewater Treatment Plant, located in downtown Olympia. The project was built in several segments and Katspan contracted to construct the Downtown Olympia segment. The City agreed to pay Katspan in increments totaling about $1.8 million. The contract contained specific protest provisions and procedures.
¶ 5 Katspan agreed to have two crews working on the project at all times. The contract segmented Katspan's work into city blocks and provided that Katspan had 17 calendar days to complete work on any given block and 90 days to complete the entire project. Katspan planned to begin work on September 5, 2000, and the project's scheduled completion date was December 4, 2000.
¶ 6 Katspan did not meet all of its contractual obligations, including the contract schedule.

B. Contract Provisions
¶ 7 Section 1-04.5 of the contract between the City and Katspan set out the required protest procedure. If Katspan wished to file a protest against the City, the contract required Katspan to immediately provide written notice of its protest. Thereafter, Katspan had 15 days to supplement the protest with a written statement that included the date of the protested order, the nature and circumstances that caused the protest, the contract provisions that supported the protest, the estimated cost of the protested work, and an analysis of the progress schedule.
¶ 8 The contract also required Katspan, if the protest was continuing, to provide the project engineer with a written statement of the actual adjustment it requested. And it required Katspan to keep records of extra costs and time incurred and to allow the project engineer access to those records.
¶ 9 Section 1-09.11(1) stated that if negotiations under Section 1-04.5 failed to provide a satisfactory result, Katspan "shall pursue the more formalized method outlined in Section 1-09.11(2) for submitting a claim." Clerk's Papers (CP) at 53. Section 1-09.11(2) required Katspan to submit a claim containing detailed and specific information. Section 1-09.11(3) limited the time in which Katspan could bring a claim or cause of action against the City to 180 days after the date of final acceptance of the project. Failure to bring a claim within the required time barred any claims or causes of action.

C. Pre-Completion Correspondence
¶ 10 On January 5, 2001, LOTT sent Katspan a letter granting a 20-day extension for the overall contract deadline. Katspan responded that it did not agree with the extension time and it referred to an earlier letter it had sent regarding additional costs it had incurred on the project. Neither letter Katspan sent complied with the contract's protest requirements.
¶ 11 On February 26, 2001, Katspan sent another letter to LOTT. This one sought to preserve its right to request additional *867 time and money and stated that Katspan would prepare additional documentation to support its request and that it would contact LOTT to discuss the request. Katspan did not provide the documentation nor arrange a meeting.
¶ 12 In April 2001, the City sent Katspan a letter informing Katspan that LOTT considered Katspan to have breached the contract because of Katspan's failure to meet the contractual deadlines. The City acknowledged that LOTT was willing to grant an extension, but it demanded that Katspan complete its work on the project. The letter also notified Katspan that LOTT reserved "its right to withhold liquidated damages from future pay applications and to pursue liquidated damages accrued by Katspan." CP at 338.
¶ 13 Katspan disputed that it had breached the contract. It acknowledged that it had not completed the project in the contract's required timeframe, but it stated that the delays were a result of changes to the work in the original bid. It further disputed LOTT's reservation of a right to pursue liquidated damages.
¶ 14 When the project was almost completed, LOTT began to prepare to close it out and accept it as complete. As part of the close out procedure, project engineer Parametrix, Inc. sent Katspan two letters asking for the information that Katspan had promised in its February 26 letter. Katspan responded that the information would be coming shortly, but Katspan never sent it. Parametrix then sent Katspan a letter requesting that Katspan execute a change order for all additional work, which Katspan did not do.
¶ 15 Before Katspan completed the project, the company became insolvent and Katspan assigned all of its rights under the contract to American Safety.
¶ 16 In July 2001, LOTT initiated a unilateral close out of the project. On September 10, 2001,[1] LOTT accepted the project as finally complete.

4. Post-Completion Communications
¶ 17 In November 2001, American Safety sought an equitable adjustment for $767,995.02 from the City for Katspan's delays, which caused extra costs to Katspan. The request did not follow the specific requirements for a formal administrative claim under the contract.
¶ 18 By March 2002, American Safety had not received a response from the City, so its attorney contacted the City's attorney. Thereafter, the City notified American Safety that it needed additional information and documentation in order to make the requested equitable adjustment. American Safety communicated to the City that it was having difficulty obtaining the requested documents from Katspan and asked if the City would be willing to enter into negotiations without the information. The City responded that it would proceed but that it would not negotiate a claim that had inadequate "backup information." CP at 331.
¶ 19 In May 2002, American Safety sent the City two three-ring binders containing information pertaining to the adjustment request. In August 2002, the City responded that it needed additional information regarding the basis of the costs for which American Safety was claiming reimbursement. In November 2002, the City again requested additional information from American Safety. Finally, in January 2003, American Safety notified the City that it had received four or five boxes of documents from Katspan and that the boxes were available for review. The City reviewed the documents and on April 23, 2003, it notified American Safety that the documents did not contain all of the requested/required information. It stated that American Safety had until May 16, 2003, to produce the information and if it failed to do so, LOTT would deny American Safety's claim. American Safety failed to meet the deadline.
¶ 20 On July 31, 2003, American Safety, through its consultant, contacted the City to discuss the outstanding information the City was demanding. The City's forensic accountant, Paul Pederson, responded on August 4, *868 2003, and stated that he had "been given the green light to discuss the LOTT matter." CP at 414. In August 2003, the consultants exchanged emails about the information and how American Safety should format it.
¶ 21 On May 21, 2004, American Safety contacted the City to notify it that the information was available. The City responded, denying American Safety/Katspan's claim and stating that it was no longer willing to consider the matter. It further stated that American Safety/Katspan could no longer file a lawsuit on the matter because a suit was now untimely under the contract.

II. PROCEDURAL FACTS
¶ 22 In August 2004, American Safety sued the City. The City counterclaimed alleging that Katspan breached its contract with the City when it failed to timely complete the work on the LOTT project. The City alleged that it was entitled to liquidated damages.[2]
¶ 23 The City moved for summary judgment, arguing that the contract's suit limitation period precluded American Safety from bringing its claim. The court granted the motion and, in its oral decision, stated that the City did not waive any of its rights under the contract, that "there's got to be an unequivocal, clear waiver," and American Safety did not meet its burden in proving such unequivocal acts. Report of Proceedings a 24.
¶ 24 Subsequently, the City moved for an award of attorney fees, which the court also granted.
¶ 25 American Safety appeals.

ANALYSIS

I. STANDARD OF REVIEW
¶ 26 When reviewing an order of summary judgment, we engage in the same inquiry as the trial court. Grundy v. Thurston County, 155 Wash.2d 1, 6, 117 P.3d 1089 (2005). Summary judgment is appropriate only if the pleadings, affidavits, depositions, and admissions on file demonstrate the absence of any genuine issues of material fact and that the moving party is entitled to judgment as a matter of law. CR 56(c). The court must consider all facts submitted and all reasonable inferences from them in the light most favorable to the nonmoving party. Grundy, 155 Wash.2d at 6, 117 P.3d 1089. The court should grant the motion only if, from all the evidence, reasonable persons could reach but one conclusion. Lilly v. Lynch, 88 Wash. App. 306, 312, 945 P.2d 727 (1997).

II. ISSUES OF FACT
¶ 27 American Safety argues that the trial court erred in granting summary judgment because material issues of fact existed about whether the City (1) waived the 180-day lawsuit limitation period; (2) waived the contract's time requirement for submitting a request; and (3) behaved in a manner that prevented American Safety from complying with the contract's claim information requirements.

A. Waiver
¶ 28 Generally, procedural contract requirements must be enforced unless the benefiting party waives them or the parties agree to modify the contract. Mike M. Johnson, Inc. v. Spokane County, 150 Wash.2d 375, 386-87, 78 P.3d 161 (2003).
¶ 29 A party that benefits from a contract's provision may waive that provision. Mike M. Johnson, 150 Wash.2d at 391, 78 P.3d 161. That waiver may be implied by the party's conduct, but waiver by conduct "requires unequivocal acts of conduct evidencing an intent to waive." Mike M. Johnson, 150 Wash.2d at 391, 78 P.3d 161 (quoting Absher Constr. Co. v. Kent Sch. Dist. No. 415, 77 Wash.App. 137, 143, 890 P.2d 1071 (1995)). Whether a party has implicitly waived a contractual provision is a mixed question of fact and law. Reynolds Metals Co. v. Electric Smith Constr. & Equip. Co., 4 Wash.App. 695, 700, 483 P.2d 880 (1971).
Occasionally [waiver] is proved by the express declaration of the party, or by his undisputed acts or language so inconsistent with his purpose to stand upon his rights as to leave no opportunity for a *869 reasonable inference to the contrary. Then the waiver is established as a matter of law.
Reynolds, 4 Wash.App. at 700, 483 P.2d 880 (quoting Alsens Am. Portland Cement Works v. Degnon Contracting Co., 222 N.Y. 34, 37, 118 N.E. 210 (1917)).
¶ 30 But waiver becomes a question of fact for the jury when the party seeks to prove it by using various forms of evidence such as declarations, acts, and non-feasance. Reynolds, 4 Wash.App. at 700-01, 483 P.2d 880 (quoting Alsens, 222 N.Y. at 37, 118 N.E. 210). And that kind of evidence creates different inferences that do not "directly, unmistakably or unequivocally establish [waiver]." Reynolds, 4 Wash.App. at 700, 483 P.2d 880 (quoting Alsens, 222 N.Y. at 37, 118 N.E. 210). In short, "[w]hen facts proved without dispute require the exercise of reason and judgment, so that one reasonable mind may infer that a controlling fact exists and another that it does not exist, there is a question of fact." Reynolds, 4 Wash.App. at 701, 483 P.2d 880 (quoting Alsens, 222 N.Y. at 37, 118 N.E. 210). The burden of proof rests with the party claiming waiver. Jones v. Best, 134 Wash.2d 232, 241-42, 950 P.2d 1 (1998).

B. Lawsuit Limitation Period
¶ 31 American Safety points to several letters the City sent after the 180-day period had ended, which it argues created a genuine issue of fact about whether the City waived the limitation period. Specifically, it points to the City's letters and emails sent on March 25, 2002, August 1, 2002, October 2, 2002, November 12, 2002, and April 23, 2003. American Safety argues that none of those letters mentioned the limitation period and, in fact, indicated that the City was still willing to consider the claim well past the 180-day period.
¶ 32 The City primarily relies on our Supreme Court's decision in Mike M. Johnson, 150 Wash.2d at 378, 78 P.3d 161. It argues that here, as in Mike M. Johnson, the trial court did not err in refusing to find that a material issue of fact existed because reasonable minds could not differ on whether the City intended to waive the contract terms. 150 Wash.2d at 377-78, 78 P.3d 161.
¶ 33 But the facts in Mike M. Johnson differ from those here. There, Spokane County hired Mike M. Johnson, Inc. (MMJ) to construct two sewer projects. Mike M. Johnson, 150 Wash.2d at 378, 78 P.3d 161. The contract allowed the County to change the projects through a change order so long as the work remained in the general scope of the contract. Mike M. Johnson, 150 Wash.2d at 378, 78 P.3d 161. The County entered a change order and during the course of the work on the change order, MMJ had to stop work because it encountered a buried telephone line. Mike M. Johnson, 150 Wash.2d at 378-89, 78 P.3d 161. The delay caused MMJ to incur additional costs and it sought compensation from the County, but it failed to follow the contract's prescribed notice, protest, and claim procedures. Mike M. Johnson, 150 Wash.2d at 380-81, 78 P.3d 161. Instead, MMJ sent the County a letter discussing its multiple concerns. The County responded by requesting that MMJ follow the specific contractual procedures. Mike M. Johnson, 150 Wash.2d at 380, 385, 78 P.3d 161. Despite MMJ's failure to follow those procedures, the parties exchanged several more letters in which the County repeatedly referred to the contract's provisions and repeatedly asserted its rights under the contract. Mike M. Johnson, 150 Wash.2d at 380-83, 78 P.3d 161.
¶ 34 Our Supreme Court found that the benefiting party, the County, had not waived its right to enforce the notice provisions of its contract with MMJ because it continuously asserted that it did not intend a "waiver of any claim or defense." Mike M. Johnson, 150 Wash.2d at 392, 78 P.3d 161. The Court further declined to find waiver in the County's continued negotiations with MMJ because such a finding would "have the [C]ounty unrealistically halt all discussions for fear of evidencing its intent to waive mandatory claim provisions under the contract." Mike M. Johnson, 150 Wash.2d at 392, 78 P.3d 161.
¶ 35 In contrast, here, the City referred to strict compliance with the contract terms in only three instances. Two of those letters were before final completion and acceptance *870 of the job and well before any limitation period began to run. For example, in its April 2, 2001 letter the City/LOTT notified Katspan that the City considered Katspan to be in breach of contract. The City stated that it reserved its right to withhold liquidated damages and that it "reserves its right to demand strict compliance with all other terms of the contract." CP at 338.
¶ 36 And in its April 18, 2001 letter the City stated:
Despite Katspan's assertion that it has made specific and formal reservation of its rights, LOTT has not received any such notification and does not believe that Katspan has met the requirements for protest of § 1-04.5 of the Standard Specifications.... Thus, pursuant to § 1-09.11, Katspan has waived any claims for which it did not comply with the requirements of § 1-04.5.
CP at 327.
¶ 37 Finally, in the only letter that the City sent after the 180-day limitation period, it responded to American Safety's request for "possible quick solutions." CP at 329. It stated: "Without waiving any of its defenses, LOTT has stated several times that it is willing to negotiate these claims in order to come to a quick resolution." CP at 354 (emphasis added). Thereafter, for a period of a year and a half, the City continuously asked American Safety to provide more information; it referred to possible subsequent litigation; and it set a new date for final production of documentation of American Safety's claims. See CP at 358 (April 23, 2003 letter stating the need for certain documentation necessary "if the matter is litigated," and setting May 16, 2003 as date for delivery of documentation); see also CP at 414 (August 4, 2003 email indicating the City's consultant has "been given the green light to discuss the LOTT matter" with American Safety's consultant).
¶ 38 Further, unlike in Mike M. Johnson, here, only one issue remained:[3] whether American Safety was entitled to an equitable adjustment and, correspondingly, whether the City was entitled to liquidated damages for Katspan's breach of the contract. All negotiations and communications between American Safety and the City focused on American Safety's production of documentation related to this issue. The City did not continuously express its intent to abide by the contractual provisions.
¶ 39 If the City had no intention of allowing future litigation on American Safety's claims, it could have informed American Safety that it was relying on strict conformance with the contract terms. The City could also have halted all communication with American Safety after March 9, 2002. In Mike M. Johnson, our Supreme Court found that if Spokane County had terminated communication with MMJ, such a result would have detrimentally impacted both parties. 150 Wash.2d at 392, 78 P.3d 161. Here, if the City had terminated negotiations, it would have only detrimentally affected American Safety. And in doing so, it would have saved both parties the time, effort, and costs of continuing the search for and production of documents and information related to American Safety's claims.
¶ 40 The City's continued requests for information, its reference to future litigation, and its new deadline for production well beyond the contract limitations period create different inferences such that reasonable minds could differ about whether the City waived the contract terms. This raises a material question of fact about whether the City's intent was to rely on the contract terms to eliminate American Safety's ability to pursue its claim. Thus, it is a question of fact for the jury to decide and summary judgment was improper.

C. Protest and Claim Requirements
¶ 41 American Safety also argues that the City implicitly waived the contract's protest and claim requirements. It points to two different acts that it argues create an issue of fact about whether the City waived the protest procedure. First, it cites to the City's *871 April 23, 2003 letter, acknowledging the City's receipt of information and setting a new deadline for the City's receipt of the required additional information. Further, American Safety cites the email interaction that took place in July and August 2003, between the City and American Safety in which the City's consultant indicated that he would discuss the matter.
¶ 42 The City counters that its willingness to work with American Safety did not extend the contract's time requirement and that, although Pederson agreed to discuss the matter, he did not waive the City's contract defenses. And it argues that as an independent claims consultant, Pederson could not bind the City.[4]
¶ 43 We have discussed the equivocal nature of the City's conduct toward American Safety in the preceding section and do not repeat it here. It remains an issue of fact to be decided by the fact finder to determine whether the totality of the circumstances resulted in an implicit waiver of the contract provisions for timeliness of claims and suit.
¶ 44 But the City is correct that, as an independent forensic accountant, Pederson could not waive the City's contract rights. Before a principal can be liable for the acts of his agent, the agency relationship must first be established. Stansfield v. Douglas County, 107 Wash.App. 1, 17, 27 P.3d 205 (2001) (quoting Matsumura v. Eilert, 74 Wash.2d 362, 363, 444 P.2d 806 (1968)). An agency relationship may exist, either expressly or implicitly, when one party acts at the instance of and, in some material degree, under the direction and control of the other. Stansfield, 107 Wash.App. at 17, 27 P.3d 205 (quoting Matsumura, 74 Wash.2d at 368, 444 P.2d 806). Both the principal and the agent must consent to the relationship and the burden of proof rests with the party trying to assert agency. Stansfield, 107 Wash.App. at 17, 27 P.3d 205 (citations omitted).
¶ 45 Here, American Safety argues that the issue is not whether Pederson had authority to waive the contract's provision but, whether, Pederson had the authority to discuss the case. It argues that the City actually waived the provisions and that Pederson's e-mail communication indicated that he had knowledge of the City's waiver. We agree with American Safety that Pederson's engagement with American Safety is part of the totality of the circumstances that a trier of fact must consider in deciding whether the City implicitly waived strict enforcement of the contract between it and Katspan.
¶ 46 We hold that genuine issues of material fact exist and that the trial court erred when it granted summary judgment in favor of the City.

III. THE CITY'S ACTIONS
¶ 47 American Safety argues that the City's actions prevented American Safety from complying with the contract's informational requirements and, therefore, the City waived those requirements. Specifically, American Safety points to the City's final refusal to consider the claim.
¶ 48 American Safety cites to Division Three's holding in Weber Const. Inc., v. Spokane County, to support its argument. 124 Wash.App. 29, 98 P.3d 60 (2004), review denied, 154 Wash.2d 1006, 113 P.3d 482 (2005). There, Weber entered into a contract with the County to build a road. When it began excavating, Weber came across several boulders that were unsuitable for fill or embankments. Weber, 124 Wash.App. at 31, 98 P.3d 60. Weber had to obtain fill from another site, which caused delay and increased cost to Weber. Weber, 124 Wash. App. at 31, 98 P.3d 60. The County entered a change order permitting Weber to haul extra material, but Weber protested the change order because the County did not provide instructions on how Weber was to dispose of the boulders. Weber, 124 Wash. App. at 34, 98 P.3d 60. Weber followed the contract's required protest procedures, but it did not include one piece of required information, the cost estimate. Weber, 124 Wash. App. at 34, 98 P.3d 60. Weber could not provide the estimate without the County designating *872 a dumpsite for the boulders, and the County did not provide the needed information. Weber, 124 Wash.App. at 34, 98 P.3d 60.
¶ 49 Division Three held that Weber presented substantial evidence that it strictly complied with the contract's protest and claim procedures but that, even if it had not, the County's failure to provide the required information waived strict compliance. Weber, 124 Wash.App. at 35, 98 P.3d 60. Thus, judgment as a matter of law was erroneous, and Division Three remanded to the fact finder to determine the case on its merits. Weber, 124 Wash.App. at 35-36, 98 P.3d 60.
¶ 50 In contrast here, the City did not hold the requested information. Rather, Katspan, the defunct company, had the required information and documents, and Katspan failed to provide it to American Safety. The evidence shows that American Safety did not strictly comply with the contract's notice and protest procedures and that it took more than three years between Katspan's initial January 2001 letter indicating its disagreement with the time extension and the additional costs it had incurred and American Safety's final May 2004 notice that it had all the information the City required. During that time, unlike the County's actions in Weber, the City did not prevent American Safety from obtaining the required information from Katspan.
¶ 51 Thus, we hold that the City's actions did not prevent Katspan/American Safety from complying with the notice and protest procedure.

IV. ATTORNEY FEES
¶ 52 American Safety argues that the trial court erred in granting the City attorney fees because RCW 39.04.240 and RCW 4.84.250 allow attorney fees for the prevailing party and if we overturn the summary judgment ruling, then the City is no longer the prevailing party.
¶ 53 RCW 39.04.240 governs the award of attorney fees in public works contracts. It states that the provisions of RCW 4.84.250 through 4.84.280 apply to actions arising out of a public works contract. RCW 39.04.240(1). RCW 4.84.250 allows attorney fees to the prevailing party.
¶ 54 Because we reverse the summary judgment in favor of the City, it is not yet the prevailing party, and we reverse the trial court's attorney fees award in favor of the City.

V. ATTORNEY FEES ON APPEAL
¶ 55 The City argues that it is entitled to attorney fees on appeal.
¶ 56 Under RAP 18.1 we may grant attorney fees and expenses where an applicable statute grants a party that right. RCW 39.04.240(1) and RCW 4.84.250 allow the court to grant attorney fees and costs to the prevailing party. Because the City is not the prevailing party on appeal, we do not grant it attorney fees.
¶ 57 We reverse and remand for trial.
We concur: ARMSTRONG and HUNT, JJ.
NOTES
[1] The contract's 180-day lawsuit limitation period began on the day the project was accepted as complete. Thus, Katspan had until March 9, 2002, to file a lawsuit under the contract.
[2] Subsequently, the City voluntarily moved the trial court to dismiss its counterclaim.
[3] In Mike M. Johnson Inc. v. Spokane County, MMJ and the County negotiated and litigated other issues unrelated to the dispute over the change order. 150 Wash.2d 375, 384, 392, 78 P.3d 161 (2003).
[4] The City argues that Pederson was not its agent because both he and the City would have had to agree to an agency relationship, and they did not.