

FILE
IN CLERKS OFFICE
SUPREME COURT, STATE OF WASHINGTON
DATE APR 0 9 2015
CHIEF JUSTICE

This opinion was filed for record
at 8:00 am on April 9, 2015

Ronald R. Carpenter
Supreme Court Clerk

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| Respondent, | ) | No. 89912-6 |
| v. | ) | En Banc |
| RONALD WAYNE MACDONALD, | ) | |
| Petitioner. | ) | Filed APR 0 9 2015 |

WIGGINS, J.—Ronald Wayne MacDonald entered into a plea agreement for second degree murder with the prosecutor in exchange for recommending a 5-year suspended sentence with 16 months' confinement in King County jail, with credit for time served. At sentencing, the investigating police officer, purportedly speaking on behalf of the victim, advocated for a sentence contrary to the agreement. The trial court gave MacDonald the maximum sentence, and the Court of Appeals affirmed.

We hold that the investigating officer was functioning as a substantial arm of the prosecution and should not have been permitted to advocate against the plea bargain. Therefore, the State breached the plea agreement by undercutting the agreed sentencing recommendation. We reverse the Court of Appeals and remand with instructions to permit MacDonald to either withdraw his guilty plea or seek specific performance of the plea agreement.

FACTS

In 1978, Arlene Roberts was found dead in her home. Her trailer had been ransacked, her hands and ankles were bound with stockings, she had a garment tied around her mouth, and a ligature made from a hairnet was around her neck. She was 80 years old. The cause of death was asphyxiation by strangulation, and the case was listed as a homicide. The police collected several latent fingerprints from bank statements and traveler's checks within her trailer but never identified a suspect. The case went inactive.

In 2010, detective Scott Tompkins reviewed the case files and matched the fingerprints to MacDonald, who was living at that time in Reno, Nevada. Tompkins noted that MacDonald had numerous burglary arrests between 1978 and 1980 and that MacDonald lived near Roberts at the time of her death. Tompkins flew to Nevada to obtain a DNA (deoxyribonucleic acid) sample and fingerprints. He also interviewed MacDonald and prepared him for extradition. Following this interview, the State charged MacDonald with murder in the first degree.

After the trial began, the parties entered into plea negotiations. MacDonald argued that DNA taken from the crime scene was exculpatory, that there were no fingerprints tying him to the murder, and that the age of the case would create significant problems for the State. The State agreed that the prosecutor would change the charge from first degree felony murder to second degree manslaughter and recommend a five-

year suspended sentence in exchange for an *Alford*[1] plea. MacDonald accepted the plea agreement.

At sentencing, Deputy Prosecutor Kristin Richardson informed the court that detective Tompkins wished to speak on behalf of the victim pursuant to RCW 9.94A.500. Though Tompkins had remained involved throughout the plea negotiations and Richardson intended for Tompkins to sit at counsel's table pursuant to ER 615 in order to assist her, Richardson asserted that she did not know what Tompkins wanted to say. MacDonald objected, but the trial court permitted Tompkins to testify as a victim advocate over MacDonald's objection.

Tompkins immediately asked the court to impose the maximum sentence. He asked to present what happened to the victim and provided the court with a series of marked photographs of the victim's body as police found her. Tompkins informed the court that the medical examiner's report contained 18 paragraphs detailing her injuries and then asserted that Roberts "died a horrific death."

Tompkins continued, attacking each of the points raised by MacDonald in favor of the plea agreement. Tompkins argued that the DNA evidence was not exculpatory and related several of MacDonald's unrecorded admissions to the court. He further testified that, because of his 14 years' experience as a robbery-homicide officer, it was his opinion that this was not a sophisticated crime and that "people like [MacDonald] in

---

[1] *North Carolina v. Alford*, 400 U.S. 25, 91 S. Ct. 160, 27 L. Ed. 2d 162 (1970). "In an *Alford* plea, the defendant does not admit guilt but concedes that a jury would most likely convict him based on the strength of the State's evidence." *State v. Scott*, 150 Wn. App. 281, 294-95, 207 P.3d 495 (2009) (citing *State v. Newton*, 87 Wn.2d 363, 372, 552 P.2d 682 (1976)).

that age group are the people that kill elderly women." He then implored the court, speaking as a cold case detective, to hold someone accountable for this crime.

The trial court imposed the maximum sentence, giving MacDonald 60 months in prison with a minimum sentence of 55 months and credit for time served. MacDonald informed the court that he was considering a motion to withdraw the plea based on a violation of the plea agreement.

MacDonald timely moved to withdraw his plea. Because the trial court judge had retired, the motion was transferred to the Court of Appeals. The Court of Appeals denied this motion and affirmed MacDonald's conviction in an unpublished decision. *State v. MacDonald*, noted at 179 Wn. App. 1006, 2014 WL 231981. We granted review. 180 Wn.2d 1008, 325 P.3d 913 (2014).

## ANALYSIS

We reverse the Court of Appeals and permit MacDonald to elect whether to withdraw his guilty plea or to seek specific performance. We affirm our decision in *State v. Sanchez* that investigating officers cannot make sentence recommendations contrary to a plea agreement. 146 Wn.2d 339, 46 P.3d 774 (2002).

We also hold that the same due process concerns precluding an investigating officer from undermining a plea agreement bar that officer from making unsolicited remarks on a victim's behalf to the court at sentencing that are contrary to the plea agreement. Washington's crime victims' rights laws do not permit the State to breach a plea agreement.

4

I.    Standard of Review

We review constitutional issues, like questions of law, de novo. *State v. Gresham*, 173 Wn.2d 405, 419, 269 P.3d 207 (2012). A reviewing court applies an objective standard to determine whether the State breached a plea agreement. *State v. Sledge*, 133 Wn.2d 828, 843 n.7, 947 P.2d 1199 (1997).

Harmless error review does not apply when the State breaches a plea agreement. *State v. Carreno-Maldonado*, 135 Wn. App. 77, 87-88, 143 P.3d 343 (2006) (citing *In re Pers. Restraint of James*, 96 Wn.2d 847, 849-50, 640 P.2d 18 (1982)); *accord Santobello v. New York*, 404 U.S. 257, 92 S. Ct. 495, 30 L. Ed. 2d 427 (1971)). Because the State's conduct in breaching the agreement eliminates the basis of that bargain, the State cannot benefit from the bargain. *Carreno-Maldonado*, 135 Wn. App. at 88.

II.    Plea Agreements

A plea agreement is a contract between the State and the defendant. *Sledge*, 133 Wn.2d at 838. The State thus has a contractual duty of good faith, requiring that it not undercut the terms of the agreement, either explicitly or implicitly, by conduct evidencing intent to circumvent the terms of the plea agreement. *Id.* at 840; *State v. Jerde*, 93 Wn. App. 774, 780, 970 P.2d 781, *review denied*, 138 Wn.2d 1002, 984 P.2d 1033 (1999). "Fairness is mandated to ensure public confidence in the administration of our justice system." *Sledge*, 133 Wn.2d at 839.

In addition to contract principles binding the parties to the agreement, constitutional due process "requires a prosecutor to adhere to the terms of the agreement" by recommending the agreed upon sentence. *Id.* (plea agreements

concern fundamental rights of the accused and thus are more than simple common law contracts). By pleading guilty to a crime, defendants waive significant rights. These rights include the right to a jury trial, the right to confront accusers, the right to present witnesses in his defense, the right to remain silent, and the right to have the charges against him proved beyond a reasonable doubt. *Santobello*, 404 U.S. at 264 (Douglas, J., concurring). However, in exchange for these waivers, the defendant receives the benefits of the bargain. When the State breaches a plea agreement, it "undercuts the basis for the waiver of constitutional rights implicit in the plea." *State v. Tourtellotte*, 88 Wn.2d 579, 584, 564 P.2d 799 (1977).

III.   Investigating Officers

This court has held that an investigating officer (IO) could not undermine the prosecution's plea bargain. *Sanchez*, 146 Wn.2d at 370 (Madsen, J., dissenting), *id*. at 358-59 (Chambers, J., concurring/dissenting). Though neither party challenges this rule, the Court of Appeals has frequently misidentified this holding. *See State v. Lindahl*, 114 Wn. App 1, 11-12, 56 P.3d 589 (2002) ("In *Sanchez*, the court found no breach of a plea agreement in cases where . . . an investigating officer argued at sentencing for a longer sentence than that agreed to in the plea agreement"); *Carreno-Maldonado*, 135 Wn. App. at 84 (incorrectly citing *Sanchez* to support the proposition that "the State does not breach the plea bargain when . . . an investigating officer[] argue[s] for an exceptional sentence"). Therefore, we expressly affirm the rule in *Sanchez* in order to provide clarity.

We rely on *Sanchez* for the proper analysis to use when considering whether a particular state officer can advocate against a plea bargain reached between the

prosecution and the defendant. 146 Wn.2d 339. *Sanchez* was a consolidated case involving two appeals: the first appeal (petitioner Mark Harris) involved an alleged plea breach by a community corrections officer (CCO), and the second (petitioner Librado Sanchez) alleged a plea breach by an IO. *Id.* at 343. Harris alleged that his plea bargain was breached when the CCO prepared a presentence report recommending an exceptional sentence contrary to the prosecutor's standard range recommendation and when the CCO spoke in support of that report at Harris' hearing. *Id.* at 344. Harris was charged with third degree rape of a child. *Id.* He entered into a plea agreement and pleaded guilty to the lesser offense of communicating with a minor for immoral purposes in violation of RCW 9.68A.090. *Id.* The standard range sentence for the offense was 22-29 months, and the prosecutor agreed to recommend 29 months. *Id.* The CCO assigned to Harris' case prepared a presentence report pursuant to former RCW 9.94A.110 (2000) (recodified as RCW 9.94A.500). *Id.* The presentence report recommended an exceptional sentence of 60 months. *Id.* The court found the aggravating factors suggested by the CCO's presentence report and imposed a sentence of 60 months. *Id.*

Sanchez pleaded guilty to three counts of second degree child molestation. *Id.* at 342-43. Pursuant to the plea agreement, the prosecutor would not make a sentencing recommendation. *Id.* at 343. Prior to the sentencing, Dr. Jerry Miller evaluated Sanchez and recommended a special sex offender sentencing alternative (SSOSA), which would impose a partially suspended 75-month sentence. *Id.* This recommendation was contained in the CCO's presentence report. *Id.* However, the victim, the victim's parents, and the IO made statements at the sentencing hearing.

7

The IO argued against the SSOSA, arguing that Sanchez violated a position of trust, that Sanchez lied to Dr. Miller in order to receive the SSOSA, and that Sanchez's acts were "'as bad as if somebody drug someone in the bushes and violently raped them.'" *Id.* The court imposed a standard range sentence of 70 months' imprisonment, and Sanchez appealed on the grounds that the IO's testimony undercut the prosecutor's plea agreement. *Id.* at 343-46.

The *Sanchez* plurality opinion viewed the plea agreement as having been made between the prosecutor and the defendant, not between the State and the defendant. *Id.* at 348 ("'[T]he prosecutor and the defendant are the only parties to a plea agreement.'" (alteration in original) (quoting *State v. Wakefield*, 130 Wn.2d 464, 474, 925 P.2d 183 (1996))). From this premise, the plurality opinion rejected an agency analysis and held that "whether a government employee other than the prosecutor is bound by the agreement depends not on the employee's role vis-à-vis the prosecutor, but on the employee's role vis-à-vis the sentencing court." *Id.* at 348-49.

The plurality's analysis considered the statutory role that a CCO and an IO have at sentencing under former RCW 9.94A.110. *Sanchez*, 146 Wn.2d at 349, 351 ("'The court *shall* . . . allow arguments from . . . *an investigative law enforcement officer* as to the sentence to be imposed" (first alteration in original) (quoting former RCW 9.94A.110(1)). The plurality opinion concluded that this statutory authority specifically authorized argument from an IO about a sentence. *Id.* at 352. Further, the plurality opinion concluded that there was no appearance of unfairness because the IO in

8

Sanchez's case was neither a party to the plea agreement[2] nor an employee of the prosecutor's office. *Id.*

The plurality opinion concluded that Sanchez's IO did not have a duty to abide by the prosecutor's plea agreement. *Id.* The plurality opinion also held that a CCO acts on behalf of the court rather than as an arm of the prosecutor and that the CCO in Harris' case was not bound by the terms of the plea agreement. *Id.* at 354.

In the *Sanchez* dissenting opinion, four justices acknowledged the statutory role of IOs in a sentencing hearing and argued that "[b]asic agency principles and simple fairness" require that both CCOs and IOs are bound to the terms of a prosecutor's plea agreement. *Id.* at 359 (Madsen, J., dissenting). Because plea agreements are contracts, the dissent considered the pivotal issue to be "whether IOs and CCOs are agents of the state, or independent agents of the court." *Id.*

The dissent's analysis began by asserting that "[t]he authority of a Washington prosecuting attorney to act as an agent of the state of Washington is well established." *Id.* at 360. The dissent cites the state constitution and previous decisions recognizing that prosecutors are agents of the State when prosecuting violations of state law. *Id.* (citing *Sledge*, 133 Wn.2d at 839 n.6; *Whatcom County v. State*, 99 Wn. App. 237, 993 P.2d 273 (2000)).

Proceeding from the conclusion that prosecutors are agents of the State, the dissent then addressed the statutory relationship between prosecutors and IOs in the

---

[2] This point is distinguishable from MacDonald's case. Here, Tompkins (the IO) was heavily involved in the plea negotiations and copied on all correspondence related to the plea agreement. An agreement to enter a plea was reached only after Tompkins and the prosecutor discussed the issue at length.

context of a plea agreement in a criminal case. *Id.* at 360-61. Pointing out that "'[a] prosecuting attorney is dependent upon law enforcement agencies to conduct the necessary factual investigation which must precede the decision to prosecute,'" *id.* at 361 (quoting former RCW 9.94A.440(2)(b)(i) (2000), recodified as RCW 9.94A.411), the dissent concluded that IOs must fully apprise the prosecution of their investigative techniques and that the prosecutor may "'insist upon further investigation'" and may "'specify what that investigation needs to include.'" *Id.* (quoting former RCW 9.94A.440(2)(b)(i)). Based on these statutory duties that prosecutors have to direct the activities of law enforcement, the dissent reasoned that IOs are agents of the prosecution.[3] *Id.* at 361-62.

Having concluded that IOs are agents of the prosecution, the *Sanchez* dissent would have held that IOs are bound by the State's plea agreements. *Id.* at 362. Thus, the constitutional due process concerns that adhere when the prosecutor undercuts a plea bargain apply when an agent of the prosecution undercuts that agreement. *Id.* at 367. The dissent then analyzed the language of former RCW 9.94A.110 in the context of our jurisprudence limiting arguments that undermine plea agreements. *Id.* Notably, the dissent observed that former RCW 9.94A.110 required both prosecutors and IOs to make recommendations at a sentencing hearing but that it was undisputed that this authorization did not permit prosecutors to undercut a plea bargain. *Id.* at 363.

---

[3] The *Sanchez* dissent also concluded that CCOs are agents of the State and would have held that the CCO's recommendations in *Harris* undercut the prosecutor's plea bargain. 146 Wn.2d at 362-63 (Madsen, J., dissenting). However, only four justices agreed on this point and the status of CCOs is not relevant to the disposition of MacDonald's case.

The dissenting opinion concludes by noting that Florida and the federal courts recognize the "inherent unfairness of allowing other state agents to undermine a bargained-for plea." *Id.* at 368 (citing *Lee v. State*, 501 So. 2d 591, 593 (Fla. 1987)). Recognizing that permitting Sanchez's IO to undermine the plea agreement is "unfair," the dissent further opined that the IO's testimony renders the "prosecution's agreement meaningless" and that it "will deter future plea agreements." *Id.* at 370. The dissent would hold that IOs "are bound to prosecutorial plea agreements." *Id.*

A third opinion in *Sanchez* by Justice Chambers partially concurred and partially dissented, agreeing with the plurality opinion that a CCO functions as an agent of the court when issuing his mandatory presentence report. *Id.* at 356 (Chambers, J., concurring/dissenting). However, Justice Chambers agreed with the dissent that "[i]nvestigating officers are so integral to the prosecutorial effort that to permit one to undercut a plea agreement would, in effect, countenance the State's breach of promise in violation of *Santobello*." *Id.* at 358.

Though Justice Chambers agreed with the four dissenting justices that IOs are bound by a plea agreement, he adopted the plurality opinion's analysis. He began by acknowledging the significant rights that a defendant waives when he or she agrees to plead guilty. Justice Chambers reminded the court that this waiver of rights obligates the State to comply with any promises that it makes. *Id.* at 357-58 (citing *Santobello*, 404 U.S. at 262). He then analyzed the role of each state officer and concluded that the IO in *Sanchez* functioned as an investigating arm of the prosecution. *Id.* at 358.

Thus, five justices held that an IO is an investigating arm of the prosecutor and therefore may not undermine a plea agreement. This is the holding of the *Sanchez* court, and we adhere to it today.

Following *Sanchez*, it is clear that determining whether an officer may advocate against a plea bargain requires us to look at the role of the state officer. The critical inquiry is whether the officer was acting in the role of assisting the court or whether the officer was assisting the prosecutor. In Washington, the statutory relationship between prosecutors and IOs binds IOs to plea agreements in a criminal case. *Id.* at 360-61 (Madsen, J., dissenting). In outlining the relationship between the IO and the prosecutor's office, the legislature created a relationship where "'[a] prosecuting attorney is dependent upon law enforcement agencies to conduct the necessary factual investigation which must precede the decision to prosecute.'" *Id.* at 361 (Madsen, J., dissenting) (quoting former RCW 9.94A.440(2)(b)(i)). The statutory scheme enables the prosecutor's office to direct the activities of law enforcement: IOs must fully apprise the prosecution of their investigative techniques, the prosecutor may "'insist upon further investigation,'" and the prosecutor may "'specify what that investigation needs to include.'" *Id.* (quoting former RCW 9.94A.440(2)(b)(i)). Based on these statutory duties, we reaffirm the holding in *Sanchez* that IOs function as a substantial arm of the prosecution.

Applying these principles to MacDonald, we hold that detective Tompkins was acting in the role of substantially assisting the prosecution. Tompkins initiated the investigation, he personally pursued the investigation, and his affidavit of probable cause resulted in charges being filed against MacDonald. The prosecutor intended to

have Tompkins sit at counsel's table in order to assist her during the trial. Additionally, as noted above, Tompkins was involved in the plea negotiations and copied on correspondence related to the plea agreement. An agreement to enter a plea was reached only after Tompkins and the prosecutor discussed the issue at length. Based on these facts, we conclude that Tompkins was fulfilling his statutory responsibilities and acting as a substantial arm of the prosecution. Therefore, he is barred from undermining the prosecutor's plea agreement: the constitutional due process concerns that adhere when the prosecutor undercuts a plea bargain apply with equal force when the prosecution undercuts that agreement by proxy. *Accord id.* at 359 (Chambers, J., concurring/dissenting); *id.* at 367 (Madsen, J., dissenting).

This approach is fair: defendants waive significant rights when they agree to plead guilty. This waiver of rights obligates the State to comply with any promises that it makes. *Id.* at 357 (Chambers, J., concurring/dissenting); *accord Santobello*, 404 U.S. at 262. An IO's testimony could render the "prosecution's agreement meaningless," and that could "deter future plea agreements." *Sanchez*, 146 Wn.2d at 370 (Madsen, J., dissenting); *see also Tourtellotte*, 88 Wn.2d at 584 ("If a defendant cannot rely upon an agreement made and accepted in open court, the fairness of the entire criminal justice system would be thrown into question."). Instead, Washington law recognizes that "[p]rosecutors may not do indirectly through their investigating officers what they are prohibited from doing directly." *Sanchez*, 146 Wn.2d at 359 (Chambers, J., concurring/dissenting).

13

IV.    Crime Victims' Rights

Though it acknowledges the holding of *Sanchez*, the State argues that in the absence of testimony at a sentencing hearing by a victim or victim's survivor, an IO ought to be allowed to speak for the deceased in recognition of their rights to make a statement as afforded to them under the law.  We reject this argument because it improperly seeks to elevate a victim's state's rights over an accused's due process rights as conferred by both state and federal constitutions and is inconsistent with our controlling case law.

Washington ensures that crime victims and survivors of victims have a significant role in the criminal justice system through statutes and our state constitution. *See, e.g.,* ch. 7.69 RCW; CONST. art. I, § 35 (amend. 84). The courts have an obligation to vigorously protect these rights. RCW 7.69.010. However, these rights are not considered in a vacuum; they must be considered together with a defendant's due process rights. In the event that the crime victims' rights impede the defendant's due process rights, the court must make every reasonable effort to harmonize theses distinct rights and to give meaning to all parts of the Washington State Constitution. *State v. Gentry*, 125 Wn.2d 570, 625, 888 P.2d 1105 (1995). To the extent that these rights are irreconcilable, federal due process rights supersede rights arising under Washington's statutes or constitution.

A. *Washington State Statutes Do Not Permit an IO Acting as a Victim's Advocate to Undermine a Plea Agreement*

Washington law recognizes and protects the rights of crime victims.  In recognition of "the severe and detrimental impact of crime on victims" and the

14

importance of victim and citizen cooperation with law enforcement agencies, the Washington Legislature enacted the crime victims' rights statutes in 1981. RCW 7.69.010. This legislation provides that victims will be treated with dignity, respect, and courtesy, and grants to victims and their survivors a "significant role in the criminal justice system." *Id.* Amongst other rights, chapter 7.69 RCW provides that "[t]here shall be a reasonable effort made to ensure that . . . victims and survivors of victims [have the right] to present a statement personally or by representation[] at the sentencing hearing for felony convictions." RCW 7.69.030(14). Victims, survivors of victims, and witnesses of crimes may also present a victim impact statement to the court. RCW 7.69.030(13).

The Sentencing Reform Act of 1981 (SRA), chapter 9.94A RCW, also acknowledges and provides for the rights of victims. RCW 9.94A.500 provides in pertinent part that

> [t]he court shall . . . allow arguments from the prosecutor, the defense counsel, the offender, the victim, the survivor of the victim, or a representative of the victim or survivor, and an investigative law enforcement officer as to the sentence to be imposed.

The crime victims' rights statutes must be read in conjunction with precedent protecting a defendant's due process rights in a plea bargain. We explicitly held in *Sanchez* that statutory requirements for sentencing recommendations from parties do not permit the State to undercut its plea agreement. 146 Wn.2d at 362-63 (Madsen, J., dissenting). Though RCW 9.94A.500 (formerly RCW 9.94A.110) grants statutory authority to an IO to make a sentencing recommendation, that authority does not permit the IO to undercut the prosecutor's plea agreement. *Id.* at 363 (Madsen, J., dissenting)

15

("Because a prosecutor cannot make an argument contrary to the plea agreement, the statute cannot be intended to serve as authority for a law enforcement officer to make a recommendation contrary to the prosecutor's.").

While *Sanchez* did not consider whether the investigative law enforcement officer and the representative of the victim could be the same person, the principles of that decision apply here with equal force. The statutory right to speak at a sentencing hearing does not supersede constitutional precedent from this court and the United States Supreme Court limiting arguments that undermine plea agreements. *Id.* at 367 (Madsen, J., dissenting). We now hold that RCW 9.94A.500 does not permit an IO serving as a victim's advocate in court to make a recommendation that undermines the plea agreement.

The victims' rights statutes require only a "reasonable effort" be made to ensure the specific rights of victims. RCW 7.69.030. Additionally, chapter 7.69 RCW does not give the State the right to speak for victims when they have not requested the State's assistance in communicating with the court.[4] *Carreno-Maldonado*, 135 Wn. App. at 86; RCW 7.69.030(14) (requires a reasonable effort enabling "victims and survivors of victims[] to present a statement personally or by representation[] at the sentencing

---

[4] Indeed, the facts of this case do not suggest that Detective Tompkins had any right to speak as a victim's advocate at sentencing. The statute does not confer the right to third parties to advocate, unsolicited, on a victim's behalf, and article I, section 35 (amendment 84) authorizes a representative to speak for a deceased victim when identified by the prosecutor. There is no evidence that the prosecutor identified detective Tompkins to speak as the victim's representative; in fact, the prosecutor stated that she did not even know what Tompkins wanted to say. Importantly, the prosecutor could not have identified Tompkins to represent the victim in order to argue against the plea bargain: the prosecutor cannot explicitly or implicitly undermine a plea agreement, *Sledge*, 133 Wn.2d at 838, and the investigating officer cannot undermine a plea agreement when performing a role assigned by the prosecution. *Sanchez*, 146 Wn.2d at 359 (Chambers, J., concurring/dissenting).

hearing for felony convictions"). These reasonable limitations on the exercise of victims' rights can be harmonized with a defendant's due process rights.

Contrary to the State's argument, these restrictions do not unfairly burden victims' rights to have their voices heard at sentencing. Indeed, the restrictions make sense within the statutory framework of chapter 9.94A RCW. The SRA permits IOs and victim's advocates to make recommendations to the prosecutor while negotiating plea agreements and charging orders. RCW 9.94A.411(2)(b)(i), (v). Tompkins had every opportunity to present his sentencing recommendations to the prosecutor, and the record suggests that he did so. He was copied on plea discussions between the State and MacDonald, and he stated in court that he was "on board" with the need for a plea agreement in this case. It can be inferred from the record that Tompkins advocated for Roberts and for a stronger sentence in preparing the plea agreement with MacDonald. These facts do not support a rule that would enable the IO to also serve as a victim's advocate at sentencing and to undermine the plea agreement that the IO helped to draft.

B. *The Victims' Rights Amendment to the Washington Constitution Does Not Abrogate a Defendant's Due Process Rights*

Article I, section 35 (amendment 84) of the Washington Constitution provides in relevant part that in the event that the victim is deceased or unable to address the court, "the prosecuting attorney may identify a representative to appear to exercise the victim's rights." In interpreting this provision, this court has held that "[t]he legislature and the voters of the State of Washington intended that a crime victim, or a victim's

representative, should be allowed to make a statement unless there is a direct constitutional impediment." *Gentry*, 125 Wn.2d at 628-29.

We have not considered this question in the context of a plea bargain. We held in *Gentry* that there is no constitutional impediment to using victim impact evidence during capital sentencing proceedings. *Id.* at 633. We acknowledged the United States Supreme Court's decision in *Payne v. Tennessee* in holding that Gentry's federal due process rights were not violated by the introduction of victim impact evidence during capital sentencing proceedings. *Id.* at 621 (citing *Payne v. Tennessee*, 501 U.S. 808, 111 S. Ct. 2597, 115 L. Ed. 2d 720 (1991) (Eighth Amendment to the United States Constitution is not a per se bar to victim impact evidence during capital sentencing proceedings)). We analyzed the effect of the victims' rights amendment, article I, section 35 (amendment 84), on the earlier enacted state due process rights of article I, section 3. Rather than holding that the new amendment "overruled" the earlier amendment, the court held that when the victims' rights laws conflict with a defendant's state due process rights, the court must make every reasonable effort to harmonize both rights. *Id.* at 625 (citing *Port of Longview v. Taxpayers of Port of Longview*, 85 Wn.2d 216, 232-33, 527 P.2d 263, 533 P.2d 128 (1974)).

Unlike the use of victim impact evidence during capital sentencing proceedings, there are direct federal and state constitutional impediments to an IO's undermining a plea agreement. *Sanchez*, 146 Wn.2d at 367 (Madsen, J., dissenting); *Sledge*, 133 Wn.2d at 839; *Tourtellotte*, 88 Wn.2d 579, 584; *Santobello*, 404 U.S. at 264 (Douglas, J., concurring). Thus, our inquiry turns to whether Tompkins' remarks undermined the plea agreement. We apply an objective standard to determine whether the State

breached a plea agreement; the motivations or justifications of the State are irrelevant. *Sledge*, 133 Wn.2d at 843 n.7.

We hold that Tompkins' remarks breached the plea agreement. Tompkins asked the court to impose the maximum sentence, directly contrary to the plea agreement. He asked to present what happened to the victim and provided the court with a series of marked photographs of the victim's body as police found her. His unsolicited testimony attacked each of the points in favor of the plea agreement, and he implored the court, speaking as a cold case detective, to hold MacDonald accountable for this crime. This advocacy undermined the State's plea agreement.[5]

Our holding today is in accord with the Court of Appeals, Division Two's decision in *Carreno-Maldonado*, 135 Wn. App. at 86-87. There, the court held that the State breaches a plea agreement when a deputy prosecutor makes unsolicited remarks on a victim's behalf that undermine the State's plea agreement and asserted that the Washington State Constitution does not give the State the right to speak for victims when they have decided not to speak for themselves and when they have not requested the State's assistance in otherwise communicating with the court. *Id.* at 86. Indeed,

---

[5] We respectfully disagree with the dissenting opinion. Without citation, the dissent concludes that a defendant's due process rights may be superseded by a deceased victim's rights "only under extremely narrow circumstances," dissent at 5, but does not provide any guidance or meaningful limitations on what those circumstances might be. The facts of this case suggest that under the dissent's reasoning, a defendant's federal due process rights must yield to a victim's state constitutional rights when (1) the victim is deceased, (2) the victim is not survived by any family members, (3) 32 years have passed, and (4) no one besides an investigating officer can give effect to the decedent's rights. The dissent's argument assumes that a deceased victim continues to have constitutional rights that merit suspending a defendant's due process rights but provides no guidance to trial courts for determining when to allow an investigating officer to make a recommendation to the sentencing court that is contrary to the terms of the plea bargain. In our view, under *Santobello* and *Sanchez*, an investigating officer acting as a substantial arm of the prosecution can never undermine a plea agreement.

Tompkins' comments here are similar to those in *Carreno-Maldonado*: unsolicited advocacy from a substantial arm of the prosecution that is contrary to the State's plea agreement. *See id.*

We reject the State's attempt to distinguish the *Carreno-Maldonado* holding with policy arguments in favor of a narrow exception when there are no family members or survivors to represent a victim's interests. This policy argument unfairly elevates the rights of the victim over state and federally protected rights of the accused. Contrary to the State's assertions, it is not valuing "form over substance" to require that the State respect the constitutional due process rights of an accused.

## CONCLUSION

We reverse the Court of Appeals. The proper remedy for the breach of a plea agreement is to permit the defendant to elect to withdraw the guilty plea or to seek specific performance. *State v. Barber*, 170 Wn.2d 854, 873, 248 P.3d 494 (2011). Therefore, we remand and permit MacDonald to elect to either withdraw the guilty plea or to seek specific performance of the plea agreement from the State.

_____
Wiggins, J.

WE CONCUR.

_____
Madsen, C.J.

_____

_____

_____
González, McCloud, J.

_____
Fairhurst, J.

_____

21

No. 89912-6

YU, J. (dissenting)—The majority opinion holds that a criminal defendant's

due process rights necessarily preclude an investigating officer from ever making a

sentencing recommendation contrary to a plea agreement as the representative of a

deceased victim. U.S. CONST. AMEND. V; WASH. CONST. art. I, § 3. I respectfully

disagree. In the very narrow circumstances presented by the specific facts of this

case, the trial court properly exercised its discretion to give meaning to the victim's

rights without violating the defendant's. I would affirm the Court of Appeals, and

I respectfully dissent.

ANALYSIS

The guiding inquiry is one of "[b]asic agency principles and simple

fairness." *State v. Sanchez*, 146 Wn.2d 339, 359, 46 P.3d 774 (2002) (Madsen, J.,

dissenting); *see also id.* at 356 (Chambers, J., concurring in part and dissenting in

part) (deciding the issues in light of "principles of fairness and agency"). In most

cases, those guidelines prevent an investigating officer from making sentence

recommendations that deviate from a plea agreement. Here, however, we are

presented with an unusual situation, where the officer, Detective Scott Tompkins, was the *only* practical victim representative because the crime was a homicide and the victim had no estate or surviving family to speak on her behalf. In these extremely narrow circumstances, the investigating officer should be allowed to step out of his role as an agent for the prosecutor and into the role of victim representative.

I.    An investigating officer can, and in this case did, act as a victim representative, rather than an agent of the prosecution

The question of agency is "where resolution of this case should begin." *Id.* at 360 (Madsen, J., dissenting); *see also id.* at 356 (Chambers, J., concurring in part and dissenting in part) (noting the relevance of agency principles). In an agency relationship, the principal maintains some level of direction and control over an agent and the agent acts within the actual or apparent authority expressly or impliedly granted by the principal. *Wash. Imaging Servs., LLC v. Dep't of Revenue*, 171 Wn.2d 548, 562, 252 P.3d 885 (2011) ("[T]here must be facts or circumstances that 'establish that one person is acting at the instance of and in some material degree under the direction and control of the other.'" (quoting *Matsumura v. Eilert*, 74 Wn.2d 362, 368-69, 444 P.2d 806 (1968))). The facts and circumstances presented here show that Detective Tompkins was not acting as an agent of the prosecutor when he addressed the sentencing court.

In most stages of a criminal action, the investigating officer is clearly an agent of the prosecutor. The prosecutor must "ensure that a thorough factual investigation has been conducted," RCW 9.94A.411(2)(b)(i), which includes directing specific investigations that are necessary and overseeing the timeliness of the investigation and the techniques used, *id.* at (i)-(iii). When an officer is engaged in those investigative activities, he or she is acting as an agent of the prosecutor. *Sanchez*, 146 Wn.2d at 357-58 (Chambers, J., concurring in part and dissenting in part), 361-62 (Madsen, J., dissenting). When Detective Tompkins spoke to the court at sentencing, however, he was not engaged in those activities.

Furthermore, the events that occurred at the sentencing hearing clearly show that Detective Tompkins was not acting as a prosecutorial agent. The prosecutor brought Detective Tompkins' desire to speak to the court's attention, but there is no evidence the prosecutor asked or encouraged him to speak or had any influence on what he said.[1] The prosecutor explicitly distinguished her sentencing recommendation, which was consistent with the plea agreement, from anything Detective Tompkins might say:

> He has asked me to ask the court if he could speak. Arlene Roberts
> has no family. Detective Tompkins has -- I've made clear to him that
> I don't want to know what he's going to say. I have no idea what it
> will be. It doesn't do anything to affect my recommendation. My

---

[1] If the prosecutor had in fact appointed a victim representative or elicited testimony from one, the representative would be acting much more at the request and direction (that is, much more like an agent) of the prosecutor than Detective Tompkins did.

recommendation is still solidly for 16 months because that's what the agreement was. So with the court's permission, Detective Tompkins would like to speak.

Clerk's Papers (CP) at 191-92; *cf. State v. Sledge*, 133 Wn.2d 828, 842-43, 947 P.2d 1199 (1998) (plea agreement breached where the prosecutor "insist[ed] upon a hearing" and actively elicited testimony that served no purpose "other than to vitiate and contradict the State's standard range recommendation").

The sentencing court explicitly allowed Detective Tompkins to speak solely on behalf of the victim and not as an agent or representative of the prosecutor:

> As I understand it, Detective Tompkins is here speaking with respect to the victim.
> In many cases, if not all criminal cases, particularly serious ones such as this, a victim advocate very frequently speaks to the court on behalf of the victim. There is no victim advocate speaking here today, and I think Detective Tompkins may take that role.

CP at 194; *see also id.* at 197 ("I want to make clear that I allowed Detective Tompkins to speak insofar as he is speaking on behalf of the victim since there's not a victim advocate here today and not so much as a comment on the nature of the plea negotiations or the evidence as such."), 210 ("I want to make clear that, as I stated before, I took Detective Tompkins' statements really as a substitution for any victim advocate, and I don't believe that the court construed it in any way to be other than that.").

The trial court's careful explanation of its decision and reasoning makes it clear that trial court judges need no additional guidance from us on recognizing the

difference between acting as an investigative agent of the State and providing a voice to a homicide victim at a sentencing hearing. Detective Tompkins was not acting as an agent of the prosecution when he spoke at sentencing, but as a representative of the victim. The prosecutor did not attempt to undercut or circumvent the plea agreement.

II.     It is only under extremely narrow circumstances that an investigating officer should be allowed to serve as a victim representative

While it is possible for an investigating officer to act as a representative for a victim, whether he or she should be allowed to do so is another matter entirely. Usually it will not be appropriate. In the extremely narrow circumstances presented here, however, the *only* reasonable way to give effect to the victim's constitutional rights was to allow Detective Tompkins to step out of his agency relationship with the prosecutor and speak as a representative of the victim.[2] A bright-line rule that the investigating officer can never speak on behalf of a victim requires the defendant's rights to supplant the victim's and silences the voices of those victims who are least able to speak for themselves.

The constitutional rights of the defendant and the victim must both be considered. The defendant has the constitutional right to due process, which includes fair proceedings and good faith on the part of the prosecutor in plea

---

[2]Contrary to the assertions of the majority, "we do not check our common sense at the door," *Diaz v. State*, 175 Wn.2d 457, 474, 285 P.3d 873 (2012), and no citation is needed to exercise it.

bargaining. *Sanchez*, 146 Wn.2d at 357 (Chambers, J., concurring in part and dissenting in part), 367 (Madsen, J., dissenting). Meanwhile, a crime victim has the "basic and fundamental right[ ] . . . to make a statement at sentencing." WASH. CONST. art. I, § 35.[3] This right cannot be minimized on the basis that the victim of a brutal homicide is deceased. Instead, where the "victim is deceased . . . the prosecuting attorney may identify a representative to appear to exercise the victim's rights. This provision shall not constitute a basis for error in favor of a defendant in a criminal proceeding." *Id.* Wherever possible, these constitutional rights must be harmonized to give effect to both. *State v. Gentry*, 125 Wn.2d 570, 624-25, 888 P.2d 1105 (1995).

If reasonable effort would or could identify anyone else to act as a victim representative, the investigating officer should not fill that role. *See* RCW 7.69.030. When an investigating officer acts as a victim representative, there is obvious potential for conflict, the officer's role must be carefully circumscribed, and the likelihood of apparent or actual unfairness is significant. In *Sanchez*, five justices correctly determined that it was unfair in the circumstances presented to allow the investigating officer to speak and to make a sentencing recommendation

---

[3]The unique position of a crime victim is also codified in our statutes. The victim's rights must be "honored and protected by law enforcement agencies, prosecutors, and judges in a manner no less vigorous than the protections afforded criminal defendants." RCW 7.69.010; *see also* RCW 7.69.030(14); RCW 9.94A.500(1).

that was inconsistent with the plea agreement. 146 Wn.2d at 358-59 (Chambers, J., concurring in part and dissenting in part), 359 (Madsen, J., dissenting). However, in that case, the victim and her parents could and did speak at sentencing. *Id.* at 343 (Bridge, J., lead opinion). *Sanchez* did not discuss the victim's constitutional rights as applied to the unusual context of this case.

Here, the victim was killed at the age of 80, over 30 years before anyone was charged with her murder. There was nobody available other than Detective Tompkins to either exercise or waive the victim's rights.[4] This is not a situation where the victim or a representative actually spoke, *see id.*, or could have spoken but chose not to, *see State v. Carreno-Maldonado*, 135 Wn. App. 77, 80, 86, 143 P.3d 343 (2006). With no family, friends, or estate to speak or request a victim representative, Detective Tompkins was the only person familiar with the horrific reality of the victim's death. Without Detective Tompkins, the victim would have had no one to speak on her behalf.

The prosecutor recommended the sentence in the plea agreement. Detective Tompkins acted as a victim representative and not as an agent of the prosecutor, and there was no one else who could have spoken on the victim's behalf. The trial

---

[4]The right to speak at sentencing belongs to the victim, not the victim's representative. *See* WASH. CONST. art. I, § 35 ("[T]he prosecuting attorney may identify a representative to appear to exercise the *victim's* rights." (emphasis added)). Detective Tompkins' rights, or lack thereof, are not at issue.

court properly exercised its discretion by allowing the victim's voice to be heard through Detective Tompkins, and the plea agreement was not breached.

III.    Specific performance in this context is a very limited remedy

Finally, I note that if the plea agreement had been breached, the defendant's remedy would be choosing between withdrawing his plea or specific performance of the plea agreement. *State v. Barber*, 170 Wn.2d 854, 855, 248 P.3d 494 (2011). Specific performance where a plea agreement is breached (rather than based on mutual mistake) means only that the defendant is entitled to a new sentencing hearing before a different judge where the prosecutor makes the sentencing recommendation in the plea agreement. *Id.* at 859-60. The sentencing judge would still not be bound by the recommended sentence. *State v. Harrison*, 148 Wn.2d 550, 557, 559, 61 P.3d 1104 (2003).

CONCLUSION

In the extremely narrow circumstance where the victim is deceased and has no estate or surviving family or any other representative, I would hold that it is permissible for an investigating officer to fill that role. Here, the prosecutor did nothing to undermine the State's agreed plea recommendation and the sentencing court properly exercised its discretion in allowing Detective Tompkins to address the court. I respectfully dissent.

_____

González, J.,

Stephens, J.