IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION ONE

| | | |
|---|---|---|
| THE STATE OF WASHINGTON, | ) | No. 78545-1-I |
| | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | UNPUBLISHED OPINION |
| | ) | |
| GIANNI S. CUNNINGHAM, | ) | |
| | ) | |
| Appellant. | ) | FILED: November 12, 2019 |

SCHINDLER, J. — Gianni S. Cunningham shot 17-year-old Kaylynn Voegele at close range in the head. The State charged Cunningham with murder in the second degree while armed with a firearm and unlawful possession of a firearm in the second degree. Cunningham seeks reversal of his plea of guilty to manslaughter in the first degree while armed with a firearm. Cunningham claims the prosecutor breached the plea agreement to recommend a low-end standard range sentence by addressing the sentencing memorandum and the forensic psychological evaluation the defense submitted to the court before sentencing. Cunningham also claims the prosecutor breached the plea agreement by allowing two family friends to address the court at sentencing, urging the court to impose a high-end sentence. Because the record does not support Cunningham's claim that the prosecutor breached the plea agreement, we affirm.

## Murder in the Second Degree

At approximately 10:55 p.m. on May 4, 2016, the police responded to a 911 call of a shooting at a condominium complex in Burien. The police found seventeen-year-year-old Kaylynn Voegele dead in a hallway with a gunshot wound to her head. Seventeen-year-old Gianni S. Cunningham told police that Kaylynn was his girlfriend and he was with her when she was shot.

Cunningham said he and Kaylynn were together, talking in the hallway near the laundry room for approximately 20 minutes. Cunningham said that when he opened "the door at the end of the hallway to let in some fresh air," he saw "a black BMW sedan pull up" and a black male "pointing a gun out the front passenger window at him." Cunningham told police that as he "ran up the stairs to the third level," he "heard one gunshot." After he "heard two more shots," Cunningham "ran back downstairs and saw that Kaylynn had been shot and was bleeding from her head." Cunningham told police he "ran out the door and tried to chase after the black BMW to get the license plate, but could not do so." The police found two "fresh bullet holes" in the hallway door and two shell casings in the parking lot outside the door.

The police interviewed a resident who lived in the condominium unit across the hall from where Kaylynn was shot. The resident told the police that he watched Cunningham and Kaylynn through the peephole in his door. The resident said Cunningham was "play[ing]" with a small handgun, "taking the magazine out and putting it back in and pulling back on the slide of the gun." The resident told the police that Kaylynn "continually told Cunningham to put the gun away." "At one point," the resident saw Kaylynn "bent over to do something with her bag that was sitting on the step of the

2

stairs." When Kaylynn "stood up, facing" Cunningham, the resident heard Kaylynn say, " 'I'm not afraid of you' " and "she took a step towards him." The resident saw Cunningham "step back, pull the gun out from his pocket or waistband and point it at Kaylynn's face," and "pull[ ] the trigger, shooting Kaylynn in the face from a distance of approximately one foot." The resident watched as Kaylynn "collapsed to the floor where she stood."

Immediately after shooting Kaylynn, the resident saw Cunningham run outside. After approximately a minute, the resident heard two more gunshots.

On May 9, 2016, the State charged Cunningham with felony murder in the second degree while armed with a firearm and unlawful possession of a firearm in the second degree. The prosecutor submitted the certificate for determination of probable cause and a summary and request for bail. The summary states that on April 13, 2016, three weeks before the May 9 shooting, Cunningham received a deferred disposition and probation in juvenile court for unlawful possession of a firearm in the second degree. The summary states that after shooting Kaylynn "at near point blank range," Cunningham "attempted to cover up his crime by setting up the scene to look like a drive by shooting, going as far as firing two additional shots into the occupied condominium complex." The summary states Cunningham told several witnesses that he believed Kaylynn "set him up and that he was the true target of this fictitious drive by shooting." The State requested a high bail amount because Cunningham's "actions in this case, coupled with his prior history with firearms and his complete lack of remorse for the victim, demonstrate the extreme risk he poses to public safety." Cunningham entered a plea of not guilty.

3

Forensic Psychological Evaluation

In State v. Houston-Sconiers, 188 Wn.2d 1, 20-21, 391 P.3d 409 (2017), the Washington Supreme Court held that under the Eighth Amendment to the United States Constitution, "sentencing courts must have complete discretion to consider mitigating circumstances associated with the youth of any juvenile defendant, even in the adult criminal justice system," and "discretion to impose any sentence below the otherwise applicable SRA[1] range and/or sentence enhancements." Examples of mitigating factors the court must consider at sentencing include age, immaturity, " 'failure to appreciate risks and consequences,' " the "nature of the juvenile's surrounding environment and family circumstances," and "participation in the crime." Houston-Sconiers, 188 Wn.2d at 23 (quoting Miller v. Alabama, 567 U.S. 460, 477, 132 S. Ct. 2455, 183 L. Ed. 2d 407 (2012)). The court reiterated its decision in State v. O'Dell, 183 Wn.2d 680, 688-89, 358 P.3d 359 (2015), that "a sentencing court may consider a defendant's youth as a mitigating factor justifying an exceptional sentence below the sentencing guidelines under the SRA." Houston-Sconiers, 188 Wn.2d at 24.

At the request of the defense, Dr. Sarah Heavin prepared a 30-page forensic psychological evaluation of Cunningham on June 15, 2017. Dr. Heavin reviewed medical, school, and court records and interviewed Cunningham and his family members. Dr. Heavin states that in her opinion,

> Cunningham's youthfulness, combined with his trauma history, possible fetal cocaine exposure, and antisocial role models should be considered when conceptualizing his previous offending behaviors. More specifically, it is my opinion that at the time of the offense, Mr. Cunningham likely presented as more developmentally immature and impulsive than the

---

[1] Sentencing Reform Act of 1981, chapter 9.94A RCW.

4

average 18-year-old as a result of his trauma history, fetal cocaine exposure, insecure attachment, and trauma-related symptoms.

Defense counsel provided a copy of the forensic psychological evaluation to the prosecutor.

Plea Agreement

On April 19, 2018, the State and Cunningham entered a plea agreement. The prosecutor agreed to file an amended information charging Cunningham with manslaughter in the first degree with a mandatory firearm enhancement. Cunningham agreed to plead guilty to the amended information. Cunningham stipulated to real facts "set out in the certification(s) for determination of probable cause and prosecutor's summary."

The plea agreement provides that "neither party will seek an exceptional sentence." The prosecutor agreed the State would recommend a low-end standard range sentence of 78 months for manslaughter in the first degree in addition to 60 months for the firearm enhancement.

The "Statement of Defendant on Plea of Guilty" reiterates the sentencing recommendation:

> The prosecuting attorney will make the following recommendation to the judge: STATE AGREES TO RECOMMEND 78 MONTHS CONFINEMENT IN ADDITION TO 60 MONTHS FOR THE FAE[2] TO BE SERVED CONSECUTIVELY FOR A TOTAL OF 138 MONTHS, NO CONTACT WITH FAMILY OF KAYLYNN VOEGELE, RESTITUTION TBD,[3] 36 MONTHS COMMUNITY CUSTODY, $500 VPA[4] AND $100 DNA[5] [COLLECTION FEE]. THIS IS AN AGREED SENTENCING RECOMMENDATION.

---

[2] Firearm enhancement.

[3] To be determined.

[4] Victim penalty assessment.

[5] Deoxyribonucleic acid.

The Statement of Defendant on Plea of Guilty also unequivocally states the judge is not bound by the agreed recommendation:

> The judge does not have to follow anyone's recommendation as to sentence. The judge must impose a sentence within the standard range unless there is a finding of substantial and compelling reasons not to do so or both parties stipulate to a sentence outside the standard range. If the judge goes outside the standard range, either I or the State can appeal that sentence to the extent to which it was not stipulated. If the sentence is within the standard range, no one can appeal the sentence.

Presentence Memorandum

The sentencing hearing was scheduled for June 15, 2018. On May 23, the prosecutor filed a "Presentence Statement of King County Prosecuting Attorney." The presentence memorandum identified the charges and attached and incorporated by reference the certificate for determination of probable cause, the prosecutor's summary, the amended information, and the felony plea agreement.

On June 12, the defense attorney filed a presentencing memorandum that attached the 30-page forensic psychological evaluation prepared by Dr. Heavin. The memorandum states the agreed recommendation is 138 months but asserts the crime was the result of "an immature 17-year old kid acting recklessly." The defense memorandum urges the court to read Dr. Heavin's evaluation. The memorandum states, in pertinent part:

> By the time Gianni was a teenager, he had been exposed to violence and trauma in volumes akin to a child growing up in an active warzone.
> Sarah Heavin, PhD, conducted a complete forensic psychological evaluation. Defense retained Dr. Heavin because she has a Ph.D. in clinical psychology and has a child and family specialization. . . . Dr. Heavin has particular expertise in evaluating adolescents exposed to trauma. In preparing Gianni's evaluation, Dr. Heavin conducted two clinical interviews of Gianni, conducted several collateral interviews with

members of Gianni's family; reviewed massive amounts of school records from the Seattle Public School District; reviewed substantial medical records dating all the way back to Gianni's birth in 1998; and performed psychological testing. Upon completing her evaluation, Dr. Heavin informed defense counsel that the trauma of Gianni's upbringing was one of the worst that she had ever documented. Defense urges the Court to read Gianni's psychological evaluation.

## Sentencing Hearing

At the beginning of the sentencing hearing on June 15, the prosecutor told the court, "[M]any, many friends and family of the victim Kaylynn Voegele, including her mother, her grandmother and her great-grandmother, and many other friends and family" were present and "several people" would like to address the court.

The prosecutor states the "agreed recommendation in this case is 138 months, which is the low end of the manslaughter in the first degree with the required 60-month enhancement."

The prosecutor acknowledged that "under the case law, as the court knows, currently, because the defendant was charged as an adult, under some of the case law it could be deemed that this court has somewhat unfettered discretion as to what to do with a sentence in this case."

> After this offense occurred, your honor is quite aware, as is counsel, and I have explained to the family as well, there was a great change in the law as we deal with juveniles who are tried as adults, both the auto adult statutes as well as the case law that has come out about the juvenile mind and all of that, that surrounds how we handle juvenile offenders.

The prosecutor told the court that as part of the plea agreement, Cunningham agreed "not to ask for an exceptional sentence downward." But the prosecutor notes the defense nonetheless submitted "the mitigation report" prepared by Dr. Heavin that

7

had previously been submitted to the State. The prosecutor states:

> I wanted it clear on the record that the court, or the [S]tate did consider that information and is certainly the defendant's youthfulness at the time of this offense into consideration in making this agreed recommendation with defense, and I believe defense is working under that same guise.

The prosecutor emphasized "a couple" of points "in order to support the recommendation that is being made by the parties here of why the court should stay within the sentencing range." The prosecutor states contrary to the characterization of the crime by the defense presentence memorandum and Dr. Heavin, "there is [no] mention of what the defendant did afterwards. . . . He tried to make it look like someone else did this." Contrary to the defense memorandum and the forensic evaluation, the prosecutor said that shooting Kaylynn was not beyond Cunningham's control.

> [T]o claim that somehow this was just a horrible mistake and that this is the reason why we need to keep firearms out of the hands of juveniles is really ignoring the overarching issue here, which is all of this is the defendant's fault. This may not have been his intent, but it is his fault. . . .
> . . . .
> And so it is for those reasons that we believe . . . , after great thought, . . . the court should follow and that the 138 months in custody is the appropriate sentence.

Without objection, Marta Hoskinson, Patricia Mejia, Kaylynn's great-grandmother, and Kaylynn's mother addressed the court.

Marta Hoskinson, the grandmother of Kaylynn's friend and a family friend, explained why she and her granddaughter "are changed forever" by the death of Kaylynn. Hoskinson attended the meeting that the prosecutor had with the family and close friends. Hoskinson said she "sat in horror to learn" that Cunningham "would get such little time for this horrific crime in taking such a beautiful and important life."

> I witnessed Kaylynn's family be re-victimized by the shocking information.

I would ask you, would you give him the amount of time he deserves and that would be triple what they are recommending, at least 40 years of incarceration so he cannot get out of custody and murder again?

Patricia Mejia manages several youth programs in Burien. Mejia told the court she was speaking "on behalf of [Kaylynn's] family." Mejia said Kaylynn had been in the youth program since she was 11 years old. Mejia told the court that just as she treats the teenagers in her youth program as adults, so should the court:

I know that the laws have changed, but I don't think this is a matter of a youth versus an adult. This is an individual who should be held accountable for his actions, and if on the other side that were one of my teens, I would be saying the exact same thing.

Kaylynn's great-grandmother said, "[W]hen her life was taken from us, it was an upset on the whole family, all of us."

I hope and pray that this young man, that he realizes what he has done. I hope he has the time to think about what he has done and that he won't ever want to touch another gun to take another life, because not only our family, your family has been disturbed, uprooted because of this.

Kaylynn's mother told the court she believed Cunningham "has not shown any remorse about the situation."

My daughter's last words were, "I am not afraid of you." For me that says that she had to have had a direct threat towards her, you know, in order to provoke that response. You know?
After he did this, . . . he went through these matters to cover it up. That is not the mind of a kid freaking out because they just committed an accident. That is the mind of a criminal. You know? I believe that.
And so because of these things, I feel like he should be given the higher of the sentence that he is — the range.

Cunningham's defense attorney argued youth should be treated differently than adults at sentencing "because of what the science tells us about impulsivity, poor

decision-making, [and] risk taking behavior." However, defense counsel emphasized the problem of "firearms":

> It doesn't justify anything. And frankly one of the reasons why in negotiations I can say this, the firearm enhancement, that was — one of the reasons why the [S]tate insisted is because of the fact that firearms are a problem and that if you have one, it doesn't matter if you are 17 or 27, you need to get that enhancement. And we are not challenging that. And we are not asking for an exceptional down. We are asking for an adult sentence here.

When Cunningham addressed the court, he insisted, "The truth is it was an accident, but just because it was an accident doesn't make it any better. I take full responsibility because it is all my fault. I can't even imagine the pain I inflicted upon you guys."

The court imposed a mid-range sentence of 150 months. The court stated:

> This court gives extreme d[e]ference to the attorneys who negotiate these agreements. And the reason for that is, as [defense counsel] noted, this has been months in the making and the attorneys know the case extremely well, and therefore make their recommendation to this court. But as Mr. Cunningham was advised at the time he pled, this court is not bound by that recommendation.
> And in good conscience, this is one of those cases where I am not going to grant the agreed recommendation, but I think that a mid-range sentence rather than low-end sentence is appropriate.

The court said, "I did read the full social history report on the defendant, Mr. Cunningham, who unquestionably had a very troubled, challenging youth and upbringing. And this explains much and excuses nothing."

> The legislature gives us these ranges so that we can take so many factors into consideration. The high-end, if there are aggravating circumstances, the low-end if there are mitigating circumstances.
> As a judge I start in the middle and I look to see what we have to mitigate, and as both the [S]tate acknowledges and [defense counsel] argues, we have a young man whose youth has to be taken into consideration by law as well as by science, and the fact that he has had such a challenging upbringing.

10

On the other hand, we have somebody who was precluded from having a firearm, and this could have been avoided and never happened.

This could have been charged as murder in the second degree and prosecuted in that fashion, and Mr. Gianni, or Mr. Cunningham, Gianni Cunningham has already received a substantial benefit from pleading to manslaughter rather than facing the murder in the second degree charge.

In addition, his actions immediately after this, to this court, showed significant consciousness of guilt, as noted by Kaylynn's mother. He didn't call 911, scream for help. Instead he created a cover-up story. And I consider that to be an aggravating circumstance.

Breach of Plea Agreement

Cunningham contends the prosecutor breached the plea agreement and violated due process by undermining the agreed recommendation for a low-end sentence of 138 months.

"A plea agreement is a contract between the State and the defendant." State v. MacDonald, 183 Wn.2d 1, 8, 346 P.3d 748 (2015). Both parties have a contractual duty of faith not to "undercut the terms of the agreement, either explicitly or implicitly, by conduct evidencing intent to circumvent the terms of the plea agreement." MacDonald, 183 Wn.2d at 8. While both parties must in good faith adhere to the plea agreement, they do not have to make the sentencing recommendation "enthusiastically." State v. Talley, 134 Wn.2d 176, 183, 949 P.2d 358 (1998).

"In addition to contract principles binding the parties to the agreement, constitutional due process 'requires a prosecutor to adhere to the terms of the agreement' by recommending the agreed-upon sentence." MacDonald, 183 Wn.2d at 8 (quoting State v. Sledge, 133 Wn.2d 828, 839, 947 P.2d 1199 (1997)). When a defendant pleads guilty, he waives "significant rights," including the rights to a jury trial, confront accusers, present defense witnesses, remain silent, and have charges proved beyond a reasonable doubt. MacDonald, 183 Wn.2d at 8-9. In exchange for waiving

these rights, the defendant receives the benefit of the bargain. MacDonald, 183 Wn.2d at 9. "When the State breaches a plea agreement, it 'undercuts the basis for the waiver of constitutional rights implicit in the plea.' " MacDonald, 183 Wn.2d at 9 (quoting State v. Tourtellotte, 88 Wn.2d 579, 584, 564 P.2d 799 (1977)).

We review constitutional issues de novo. MacDonald, 183 Wn.2d at 8. "We review a prosecutor's actions and comments objectively from the sentencing record as a whole to determine whether the plea agreement was breached." State v. Carreno-Maldonado, 135 Wn. App. 77, 83, 143 P.3d 343 (2006). "Harmless error review does not apply when the State breaches a plea agreement." MacDonald, 183 Wn.2d at 8.

The prosecutor breaches a plea agreement by presenting "unsolicited information by way of report, testimony, or argument that undercuts the State's obligations under the plea agreement." Carreno-Maldonado, 135 Wn. App. at 83. But the prosecutor does not breach the plea agreement by reiterating certain facts necessary to support its recommendation. Carreno-Maldonado, 135 Wn. App. 84.

Here, the defense submitted Dr. Heavin's report that addressed mitigating factors to support an exceptional sentence downward. Objectively viewed, the comments the prosecutor made during the sentencing hearing did not breach the plea agreement or violate Cunningham's due process rights. The prosecutor appropriately addressed the defense memorandum, the forensic evaluation, and the court's discretion to consider mitigating factors and youth. The prosecutor adhered to the agreement to recommend a low-end standard range sentence. In support of the agreed recommendation, the prosecutor pointed to the agreed facts that contradicted the mitigating factors described

in the forensic report and the defense memorandum. We conclude the prosecutor's remarks did not breach the plea agreement.

Cunningham cites MacDonald to argue the prosecutor also breached the plea agreement by allowing Marta Hoskinson and Patricia Mejia to address the court and urge the court to impose a much longer sentence. The State argues the court had the discretion to allow them to speak at the sentencing hearing and unlike in MacDonald, neither Hoskinson nor Mejia were agents or proxies of the State bound by the plea agreement.

Constitutional due process concerns "that adhere when the prosecutor undercuts a plea bargain apply with equal force" when an agent of the prosecution undercuts the agreement by proxy. MacDonald, 183 Wn.2d at 15. In State v. Sanchez, 146 Wn.2d 339, 46 P.3d 774 (2002), the Washington Supreme Court held that an investigating law enforcement officer may not undermine a plea agreement by advocating against a plea bargain reached between the prosecutor and the defendant. See MacDonald, 183 Wn.2d at 14 ("we adhere" to the holding in Sanchez that an investigating officer "may not undermine a plea agreement"). "The critical inquiry is whether the officer was acting in the role of assisting the court or whether the officer was assisting the prosecutor." MacDonald, 183 Wn.2d at 14. In MacDonald, the court held that an investigating officer was acting on behalf of the State and undercut the plea agreement at the sentencing hearing. MacDonald, 183 Wn.2d at 14-15.

Here, unlike in Sanchez and MacDonald, the record does not support finding Hoskinson or Mejia were State actors or acting by proxy on behalf of the prosecutor. Courts have discretion to permit individuals to act as victim's representatives and to

speak during sentencing. State v. Lindahl, 114 Wn. App. 1, 13-14, 56 P.3d 589 (2002). "Washington ensures that crime victims and survivors of victims have a significant role in the criminal justice system through statutes and our state constitution." MacDonald, 183 Wn.2d at 16 (citing WASH. CONST. art. I, § 35 (amend. 84); chapter 7.69 RCW). "The courts have an obligation to vigorously protect these rights." MacDonald, 183 Wn.2d at 16 (citing RCW 7.69.010).

Hoskinson is the grandmother of Kaylynn's friend and had been "supporting Kaylynn's family and friends since we lost her." Mejia knew Kaylynn and her family since Kaylynn began attending the Burien youth program when she was 11-years-old. Mejia told the court, "I am honored to be here on behalf of her family." See RCW 7.69.030(14) (victims and survivors may elect "to present a statement personally or by representation . . . at the sentencing hearing for felony convictions").

We reject Cunningham's claim that the prosecutor breached the plea agreement and affirm the judgment and sentence.

WE CONCUR: